Constantino AGUIRRE, Appellant,

v.

STATE of Indiana, Appellee.

No. 45S00–8705–CR–455.

Supreme Court of Indiana.

April 11, 1990.

Diane M. McNeal, Appellate Public Defender, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was convicted by a jury of attempted voluntary manslaughter, a class B felony,[1] for the shooting of Stella Guzman. I.C. 35–42–1–3; 35–41–5–1. Class B felonies carry a presumptive sentence of ten years, which can be enhanced by an additional ten years for aggravating circumstances. I.C. 35–50–2–5. The trial court found that aggravating circumstances did exist in this case and imposed the maximum sentence of twenty years. Appellant raises only one issue in this direct appeal. He claims that the sentence imposed by the trial court was manifestly unreasonable and asks that this Court exercise its power to revise sentences pursuant to Indiana Rule for the Appellate Review of Sentences 2(1).

The evidence produced at trial which tended to support the verdict showed that appellant was a divorced man whose ex-wife and children lived in Illinois. Appellant lived in a house in Hammond which had been converted into apartments. Stella Guzman, the victim, and Sanda Jefferson, a friend of appellant's, were also residents of the apartment house. On the morning of Wednesday, December 4, 1985, Jefferson came to Guzman's apartment and asked for a jump start because her car would not start. Guzman agreed and got her jumper cables from the hall, but told Jefferson that they had to hurry because she had a job interview that morning. The two women spoke briefly about an incident which had occurred two nights previously, when appellant accused Guzman of stealing his mail from the mailbox. Guzman asked what was wrong with appellant, to which Jefferson replied, "He's sick." Guzman responded, "He's sick, all right," then they went about the business at hand.

Guzman testified that she threw the cables on the ground and got into her truck to move it around to face Jefferson's car. She saw appellant come out of his apartment and walk over to the car. Guzman testified that appellant looked over at her, then charged at the truck door, jerked it open, grabbed her, and pulled her out of the truck. She testified further that appellant put a gun to her back and started shoving her toward her apartment and that he then shot her. Guzman was shot first in the abdomen, from a two- to three-foot range. She testified that as she doubled over in pain, she heard four more consecutive shots. Guzman was hit three times in the shoulder and once in the neck. She suffered a lacerated liver and a punctured lung, and she was initially paralyzed completely from the neck down. By the time of sentencing, she had regained the use of her upper body but was still confined to a wheelchair and unable to walk. All five bullets are still lodged in her body.

Appellant interposed an insanity defense. Sanda Jefferson testified that appellant had been acting strangely for several days prior to the shooting. The previous Sunday night, appellant asked Jefferson to make a doctor's appointment for him because his legs were bothering him and said he would leave a letter in her mailbox, presumably with the doctor's name and phone number on it. She forgot to call, and on Monday appellant confronted her about it and demanded to know the whereabouts of his letter. Jefferson said she had never gotten it and suggested that Guzman might have it since she typically

---

**1.** Subsequent to appellant's conviction and sentencing in 1986, the voluntary manslaughter statute was amended to make the offense a Class A felony if committed by means of a deadly weapon.

was the first in the building to get the mail delivered to the house. Appellant then went to Guzman and accused her of stealing the letter. He made similar accusations against other residents of the building. He returned to Jefferson's apartment and sat on her kitchen floor with his head in his hands, repeating, "Something's wrong." He also said that he was a woman and that "they were working him very hard and treating him real bad," and that someone was trying to trap him. Jefferson became frightened and asked him to leave. Jefferson also testified that both she and Guzman noticed that appellant was out walking around in his socks that snowy December night.

On Tuesday, appellant was sent home from work because he pushed his boss. Appellant called Jefferson and asked her to take him to her nephew's home down the block because "we have to sit in a circle and talk." He also came to her apartment and asked her to marry him and go to Mexico with him. When she declined, he grabbed her arm and told her that he was not going to give her a chance to call anybody, that he was going to take her somewhere where "they" would not find her.

Jefferson stated that appellant called her at 7:00 a.m. on Wednesday morning, complaining that he was hot and sick, saying that his legs and head hurt, and asking if she were his mother. Later that morning, appellant helped Jefferson load her clothes into her car to take to the laundromat, and at that time, he accused her of trying to do something to hurt him in connection with a Reader's Digest mailing they had both received. He asked where they were going, and Jefferson responded that she was going to the laundromat and he was to stay at the house. This exchange was repeated in the car, and appellant then pulled her keys out of the ignition and removed the car key from the ring. He said, "You staying, I'm leaving," and "Now you black and I'm white," and "Furthermore, I want my kids. I want you to give them to me now, or I kill you.... You going to give them to me." Jefferson ran into her apartment and called the police. Appellant stood on her porch and she heard him trying to pull her door open, calling for Patricia, who is appellant's ex-wife, to open the door and saying he wanted his children back. Jefferson told appellant that she had called the police, and by the time the police arrived, he had gone.

When Jefferson thought it was safe, she returned to her car, but it wouldn't start. She saw appellant drive up in his truck and, because she was afraid, lay down on the seat of her car until she heard the door to his apartment close. She then enlisted Guzman's aid in getting her car started. Jefferson testified that she saw appellant pull his gun when Guzman dropped the jumper cables on the ground, and she heard him say, "I want my kids." Jefferson started running down the block toward her nephew's house to call the police and heard the shots as she ran.

Appellant testified in his own behalf that on the Sunday night previous to the shooting, his sight became cloudy and that he could recall only isolated portions of the incidents that transpired during the next three days. He testified that his first memory of hearing shots began to return to him in March of 1986 in his jail cell. The court called the two psychiatrists appointed by the court to examine appellant in regards to his insanity defense. Dr. Batacan testified that during the examination, appellant said that he'd had a vision of a man telling him that someone was going to kill him with a knife. Dr. Batacan read from his report, quoting appellant as saying, "I opened the door, and I saw [Guzman] with something to shoot me or to kill me." Both doctors testified that appellant exhibited an impairment of ability to recall, that they did not believe appellant was fabricating, and that they did not believe that he was insane at the time of the commission of the crime.

■ Appellant's sole claim on appeal is that the sentence imposed by the trial court was manifestly unreasonable. A reviewing court is empowered to revise a sentence authorized by law if the sentence imposed is manifestly unreasonable in light of the

nature of the offense and the character of the offender. Ind.R.App.Rev.Sen. 2(1). A sentence will not be found to be manifestly unreasonable unless no reasonable person could find the sentence appropriate to the particular offense and offender. *Henley v. State* (1988), Ind., 522 N.E.2d 376, 380. Appellant urges that the trial court improperly considered and balanced aggravating and mitigating circumstances in arriving at its decision to impose the maximum sentence.

The trial court found the following aggravating circumstances to exist:

1. The defendant was in need of treatment which would best be furnished in a penal institution.

2. A reduced sentence would depreciate the seriousness of the crime.

3. The victim suffered serious and permanent injuries.

Appellant correctly points out that while the first two aggravators cited by the trial court are expressly listed in the statute governing considerations in the imposition of sentences, I.C. 35-38-1-7, the third is not, and he asserts that the trial court erred by considering the extent of the victim's injuries in aggravation. However, 35-38-1-7(d) provides that the considerations listed elsewhere in the statute do not constitute an exhaustive menu of criteria that a court may consider in determining a sentence, and this Court has previously held that the serious nature of the victim's injuries was a specific fact which the trial court could consider as an aggravating circumstance. *Lang v. State* (1984), Ind., 461 N.E.2d 1110, 1113. The injuries here, which included paralysis, resulted from five separate gunshot wounds to different parts of the body.

[2, 3] The trial court found the following mitigating circumstances to exist:

1. The defendant had no history of prior criminal conduct.

2. The defendant was suffering from some mental/emotional disorder which did not rise to the level of the insanity defense.

Appellant claims that the trial court erred by not considering in mitigation his extreme remorse, the undue hardship on his dependent children that his incarceration would cause, and his excellent employment record. The trial court must consider the evidence of mitigating factors presented by a defendant, *Inman v. State* (1985), Ind., 482 N.E.2d 451; however, a finding of mitigating circumstances is not mandatory, but rather lies within the discretion of the trial court. *Henley*, 522 N.E.2d at 380. Further, it is within the trial court's authority to assess the weight of the aggravating and mitigating circumstances found to exist and to increase or decrease the sentence accordingly as provided by statute. *Scruggs v. State* (1986), Ind., 489 N.E.2d 935, 938; *Abercrombie v. State* (1982), Ind., 441 N.E.2d 442, 445.

[4] Appellant urges that imposition of the maximum sentence was manifestly unreasonable in light of the fact that this was an isolated period of bizarre, unexplainable behavior during the course of the otherwise exemplary life of a devoted father with an excellent employment record. However, the sentence imposed by the trial court was clearly within the statutory limits, and in light of the facts of this crime and the particular aggravating and mitigating circumstances found by the trial court, we are unable to conclude that a twenty-year sentence was manifestly unreasonable.

The trial court is affirmed.

SHEPARD, C.J., and GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., not participating.