James C. HARRIS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9304–CR–482.

Supreme Court of Indiana.

Dec. 28, 1995.

Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellant.

Pamela Carter, Attorney General, Jodi Kathryn Rowe, Deputy Attorney General, Indianapolis, for appellee.

**ON DIRECT APPEAL**

SULLIVAN, Justice.

James C. Harris, defendant, and his cousins, Nelson Harris and Terry Buggs, were charged with Murder,[1] Felony Murder,[2] Conspiracy to Commit Robbery (Class A felony),[3]

---

1. Ind.Code § 35–42–1–1 (1989 Supp.).

2. Ind.Code § 35–42–1–1(2) (1989 Supp.).

3. Ind.Code § 35–41–5–2 (1988).

Robbery (Class A felony),[4] and Confinement (Class B felony)[5] on December 5, 1991. A jury trial commenced on December 7, 1992. Three days later, the jury found defendant to be not guilty of Murder and guilty of all the remaining charges. On January 5, 1993, the trial court merged the conspiracy to commit robbery charge into the robbery charge and sentenced defendant to a term of imprisonment of twenty years for Robbery, sixty years for Felony Murder, and twenty years for Confinement with all sentences to be served concurrently. We affirm.

### Background

Tony Harvey worked at Kurt's Marathon Station, which was located on North Pennsylvania Street, Indianapolis, Indiana. The owner of the gas station was Kurt Kahlo. Around 10:00 p.m. on Friday, November 22, 1991, Mr. Harvey began closing procedures for the station. About that time, defendant, accompanied by his cousins, Nelson and Terry, came to the station to visit Mr. Harvey. The three men helped Mr. Harvey finish closing the station. Mr. Harvey left $100.00 in the cash register drawer for opening the next day and dropped the day's proceeds into the safe. Mr. Harvey had a beer with the three men after they left the station. Defendant, Mr. Kahlo's former employee, knew that Kahlo told his employees to hand over any money if the station were robbed.

The next day defendant again got together with his cousins. Nelson declared that he "wanted to make some money." (R.1130). Defendant understood Nelson's statement to mean that he wanted to commit a robbery. That evening, the three drove around in Terry's girlfriend's blue Ford Mustang. Terry's girlfriend kept a .32 caliber revolver in the armrest of the Mustang. After noticing that the Shell gas station across the street from Kurt's Marathon was busy, Nelson asked defendant if Kurt's Marathon was still open. Defendant informed Nelson that it was open. After Nelson told Terry where to park the car, Nelson entered Kurt's Marathon and bought a can of pop. Nelson returned and described who was working, and defendant told Nelson that the person he had described was the owner. The three men concluded that robbing Kurt's Marathon would be easy due to Mr. Kahlo's friendly nature and the policy regarding robbery, and defendant thought there would be between five and six hundred dollars in the register. Nelson stated that he was going to shoot the guy if he did not give him the money.

As Nelson exited the car and entered Kurt's Marathon, Terry drove around the corner and parked southbound on Pennsylvania Street. A few minutes later, Nelson returned and informed his cohorts that Mr. Kahlo was dead. When defendant and Terry exclaimed that they told him not to shoot anybody, Nelson stated that he took Mr. Kahlo to the back of the station and shot him in the head because he wanted to know what it felt like to shoot someone.

Nelson gave each of his cohorts twenty-five dollars out of the one-hundred dollars he had stolen. Nelson also took two rings from Mr. Kahlo, one gold wedding band and one silver ring with diamonds. Nelson gave defendant the gold ring, but defendant threw the ring out of the car.

While the threesome attended a party, the police were called to Kurt's Marathon regarding an unattended gas station. The officers discovered Kurt Kahlo's body in the bay area at the back of the station. The cash register drawer was open and empty and a shell casing was found underneath a rag on the top of a desk near Mr. Kahlo's body.

The police located the blue Ford Mustang through an anonymous tip. When questioned, Terry informed the police that he had sold the gun Nelson used for thirty dollars. Defendant waived his constitutional rights and confessed when questioned by the police.

Kurt Kahlo died as a result of the injuries he sustained during the robbery. The autopsy revealed that he suffered a single gun shot wound to the left side of his head. The stellate shaped entrance wound and the sight imprint at the top of the wound indicated that the gun had been very tightly pressed against the victim's head when it was dis-

4. Ind.Code § 35–42–5–1 (1988).

5. Ind.Code § 35–42–3–3 (1989 Supp.).

charged. The police later determined that a bullet that was found near Mr. Kahlo's right ear came from the handgun Nelson used during the robbery.

# I

■ After the jury was sworn and the State presented its first witness, Tony Harvey, Juror Number One, Marsha Kite, realized that she had met Tony Harvey's brother, Curtis, who was also a State's witness, the previous weekend. The trial court conducted a hearing outside the presence of the jury, during which Ms. Kite was questioned by the trial court and both parties. Ms. Kite stated to the trial court that she brought her car in for service at Pete's Service Station, which was owned by Kurt Kahlo, on the previous Friday. Curtis Harvey, an employee there, drove her car home on Saturday, picked her up, and then drove back to the garage. During this time, the two engaged in "pleasant conversation about nothing in particular," (R.835), which had nothing to do with the present case. During the hearing, Ms. Kite and defense counsel had the following exchange:

> Mr. Thomas: Have you discussed this with any of the other jurors in this case?
>
> Ms. Kite: No.
>
> Mr. Thomas: Would you weigh Curtis' [sic] testimony any greater than you would anybody else's? I mean, do you think you'd tend to believe him more than somebody else because you know him and you met him and had some conversation and thought he was a nice young man?
>
> Ms. Kite: I don't honestly know. I'd like to think I could be objective.
>
> Mr. Thomas: Sure.
>
> Mr. Kite: But uh, I don't know that for certain.
>
> Mr. Thomas: Okay. Because, you know, the question here is—obviously, I mean, we spent a day trying to make sure everybody's fair and impartial and, nobody can really tell us that, unfortunately, except you. We can't hook you up to a machine. So what do you think?

> Mr. Kite: I can only tell you that I would make every effort to weigh the uh, the evidence, the testimony on its merits.
>
> Mr. Thomas: And, that you wouldn't share any of this with the other prospective jurors until the case was over?
>
> Ms. Kite: No.

(R.836–38).

At the conclusion of the hearing, defendant moved to excuse Ms. Kite and replace her with the alternate juror. After concluding that the contact between the juror and the witness was casual and that Ms. Kite appeared to be a "conscientious juror ... the kind of jurors [sic] you want," the trial court denied defendant's motion. (R.842–43).

Defendant contends that the trial court committed reversible error by denying his motion to dismiss Juror Number One because the juror stated that she would "like to think [she] could be objective" but didn't know "for certain." (R.837). The State counters that the trial court did not abuse its discretion by denying defendant's motion because the contact between the juror and the non-party State's witness was casual, no discussion of the case occurred between them, and the juror stated that she would do her best to be impartial.

■ Article I, § VIII of the Indiana Constitution guarantees a defendant's right to an impartial jury; therefore, a biased juror must be dismissed. Indiana Trial Rule 47(B) in part provides that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will only reverse such determinations where we find them to be arbitrary, capricious or an abuse of discretion. *Campbell v. State* (1986), Ind., 500 N.E.2d 174, 181; *Woolston v. State* (1983), Ind., 453 N.E.2d 965, 968, *reh'g denied.* An abuse of discretion occurs only if the decision placed the defendant in substantial peril. *Woolston*, 453 N.E.2d at 968.

■ The trial court was in the best position to assess the honesty and integrity of

Juror Number One and her ability to perform as a conscientious, impartial juror. We think the trial court could have reasonably interpreted Ms. Kite's uncertainty as expressing nothing more than natural human anxiety in one's ability to separate past experience from present judgment. This is especially so here because Ms. Kite unequivocally stated that she would make every effort to weigh the evidence presented on its merits. The trial court's conclusion that Ms. Kite's statements disclosed that she was the kind of conscientious juror that trial courts want indicates that the court was convinced that Ms. Kite had committed herself to being an objective juror notwithstanding her honest expression of normal human doubt of her ability for perfect objectivity. For these reasons, we cannot say that the trial court's denial of defendant's motion to replace Juror Number One with an alternate was an abuse of discretion that placed defendant in substantial peril.[6]

## II

■ The trial court sent all the exhibits that had been introduced into evidence back to the jury room with the jury at the beginning of jury deliberations. Defendant's video taped and audio taped confession, State's exhibits # 16 and # 17, which had been played for the jury in open court, were included. Defendant objected to these exhibits being sent to the jury room, and the trial court overruled his objection. Shortly after entering the jury room, the jury requested a transcript of the audio taped confession. The trial court, over defendant's objection, sent a tape player to the jury room instead of the transcript because the transcript had not been entered into evidence.

Defendant contends that the trial court committed reversible error by sending State's exhibits # 16 and # 17 and the tape player back to the jury room because no one could know what use the jury might make of them and that undue influence might be placed upon the exhibits. The State argues that the trial court did not abuse its discre-

tion in sending the exhibits and the tape player to the jury room at the inception of the jury's deliberations because (1) the confession was direct evidence of the commission of the crimes and defendant's participation therein, and (2) the exhibits could not have been misused by the jury because they had already been played for the jury in open court.

"It is well-established precedent in this state that the trial court has considerable discretion in deciding what a jury may appropriately take with it as it begins its deliberations." *Powell v. State* (1994), Ind., 644 N.E.2d 855, 857. In this regard, this court adopted § 5.1 of the Standards Relating to Trial by Jury (American Bar Association Project on Standards for Criminal Justice) in *Thomas v. State* (1972), 259 Ind. 537, 289 N.E.2d 508. This section provides:

5.1  Materials to jury room.

(a) the court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions.

(b) Among the considerations which are appropriate in the exercise of this discretion are:

(i) whether the material will aid the jury in a proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury.

*Thomas*, 259 Ind. at 540, 289 N.E.2d at 509.

Although defendant made no objection when State's exhibits # 16 and # 17 were admitted into evidence or when the prosecutor requested that the audio taped confession be played for the jury in open court, defendant claims that no one could know what use the jury might make of exhibits # 16 and # 17 and that the jury might place undue influence on these exhibits. However, defendant fails to demonstrate how or why the

---

6. Citing *Jackson v. State* (1992), Ind., 597 N.E.2d 950, 960, defendant asserts that Ms. Kite's relationship with the State's witness created a presumption of implied bias. We disagree. It is

well settled law that implied bias is presumed from a juror's relationship with a *party* to the trial. *Id.* In this case, Curtis Harvey was a *non-party* State's witness.

exhibits at issue unduly prejudiced his case or were subject to improper use by the jury. Here, we think that the audio taped confession served to aid the jury in its attempt to understand to what extent defendant participated in the charged crimes and how these crimes were committed. Further, there was little risk that the jury would misuse or give undue weight to these exhibits because the audio tapes had already been played in open court. The trial court did not abuse its discretion by sending State's exhibits # 16 and # 17 and a tape player to the jury room when the jury began its deliberations.

### III

■ Twenty-four hours prior to defendant's sentencing hearing defense counsel contacted the trial court and requested that the hearing be continued. The trial court informed counsel that he would grant defendant's request if defendant was willing to waive his statutory right to be sentenced within thirty days of his conviction. Upon learning that defendant refused to waive this right, the trial court announced that the original date that had been set for the sentencing hearing would not be changed. Asserting that he wished to call some character witnesses who were not present to testify on his behalf and that he was taking cold medication, defendant again moved for a continuance prior to the presentation of evidence at his sentencing hearing. After discussing defendant's prior refusal to waive his right to be sentenced within thirty days, the trial court denied defendant's motion for a continuance.

Defendant contends that the trial court abused its discretion in denying his continuance request because the court deprived him of his opportunity, under Indiana Code § 35–38–1–3 (1988), to "call witnesses and to present information in his own behalf" at his sentencing hearing. The State argues that the trial court did not abuse its discretion because defendant did, in fact, present character evidence on his behalf at the sentencing hearing and provided no evidence that the cold medication rendered him incompetent to proceed with sentencing.

■ Generally, a "[r]uling on a motion for continuance is within the trial court's discretion and will not be reversed absent a clear showing of an abuse of discretion." *Olson v. State* (1990), Ind., 563 N.E.2d 565, 569 (citing *Carter v. State* (1983), Ind., 451 N.E.2d 639). Additionally, the defendant must make a specific showing of how he was prejudiced as a result of the trial court's denial of his motion. *Beverly v. State* (1989), Ind., 543 N.E.2d 1111, 1113. Further, Indiana Code § 35–38–1–2 (1988) provides defendant with the right to be sentenced within thirty days of being convicted. Here, the record reveals that the trial court would have granted defendant's continuance request if defendant had waived his statutory right to be sentenced within thirty days of his conviction. Thus, it appears that the trial court's docket made it impossible for the court to grant defendant's motion and also comply with the thirty day sentencing requirement. Absent a showing of prejudice, we cannot say that the trial court abused its discretion by denying defendant's continuance request where defendant refused to waive the thirty day sentencing requirement.

### IV

Defendant urges this court to revise his sentence on grounds that the trial court (1) failed to consider his cooperation with the police as a mitigating circumstance and (2) improperly considered his previous employment by the victim to be an aggravating circumstance.

■ Making sentencing determinations is within a trial court's discretion, *Sims v. State* (1992), Ind., 585 N.E.2d 271, 272, and is regulated by Indiana Code § 35–38–1–7.1 (1993). The court must include within the record a statement of the court's reasons for selecting the sentence it imposes if the court finds aggravating or mitigating circumstances. Ind.Code § 35–38–1–3 (1993). The trial court's statement of reasons should include the following elements: (1) identification of all significant mitigating and aggravating circumstances; (2) the specific reason why each circumstance is determined to be mitigating or aggravating; and (3) an articulation that the court evaluated and balanced

the mitigating circumstances against the aggravating circumstances to determine if the mitigating circumstances offset the aggravating circumstances. *Hammons v. State* (1986), Ind., 493 N.E.2d 1250, 1254.

Although a court must consider all evidence of mitigating factors presented by a defendant, a finding of mitigating circumstances is within the trial court's discretion. *Aguirre v. State* (1990), Ind., 552 N.E.2d 473, 476. A trial court is not obligated to explain why it has not chosen to find mitigating circumstances. *Graham v. State* (1989), Ind., 535 N.E.2d 1152, 1155. Thus, a trial court is only required to articulate in the sentencing statement those proffered mitigating circumstances, if any, that it determines are significant.

It is undisputed that defendant gave voluntary statements to the police both before and after his arrest, and voluntarily surrendered the shoes that he wore the night that Kurt Kahlo was robbed and murdered. Defendant asserts that the trial court erred in sentencing him because it failed to consider this evidence of his cooperation with the police as a mitigating circumstance. Defense counsel argued the following mitigating factors to the trial court: (1) the fact that defendant was twenty-three years of age when the crimes were committed; (2) that he had a substance abuse problem and was drunk the night the crimes occurred; (3) that he did not drive to or from the gas station; (4) that he had cooperated with the police; (5) that he had minimal involvement with the crimes; (6) that he had expressed remorse over the victim's death. After listening to counsel's arguments the trial court expressly rejected intoxication as a mitigating factor but did find one mitigating circumstance—that "[t]he defendant is youthful." (R. 1494). Thus, the record suggests to us that the trial court heard defendant's argument on all six circumstances, commented on the one it found particularly unsupported, and made an express finding regarding the mitigator it determined to be significant. Given that the trial court explicitly responded to two of the circumstances identified—to one positively and the other negatively—we conclude that

the trial court did not overlook the mitigating circumstance presented.

Citing *Linger v. State* (1987), Ind. App., 508 N.E.2d 56, defendant contends that the trial court erroneously found the fact that the victim had previously employed the defendant to be an aggravating circumstance. In *Linger*, the Court of Appeals disapproved the use of the fact the defendant stole from his employer as an aggravating circumstance to enhance a sentence for Theft. The court reasoned that when the legislature chose to consolidate the various theft statutes in 1971 and no longer differentiate among embezzlement (theft from one's employer) and other forms of theft, it effectively made stealing from one's employer an element of the crime of theft. *Id.* at 64. Because an element of the crime cannot be used as an aggravating circumstance to enhance a sentence, *Townsend v. State* (1986), Ind., 498 N.E.2d 1198, the *Linger* court reasoned that stealing from one's employer could not be used to enhance a sentence for Theft, at least not unless the trial court found the element to be particularly egregious. *Linger*, 508 N.E.2d at 64. Regardless of whether we agree with the reasoning of *Linger*, defendant was not being sentenced for Theft so *Linger* is inapplicable. Here, the record reveals that defendant knew, through his previous employment, of the victim's friendly nature and the station policy regarding robbery and that he and his cohorts determined that Kurt's Marathon would be easy to rob based on this information. On these facts, we can not say that the trial court abused its discretion by concluding that defendant's previous employment by the victim was an aggravating circumstance.

### Conclusion

Accordingly, defendant's conviction and sentences for Felony Murder, Robbery and Confinement are affirmed.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.