## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 06 2017, 10:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lori S. James
Beaver & Beaver, P.C.
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brian Keil,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 6, 2017<br><br>Court of Appeals Case No.<br>56A05-1612-CR-2930<br><br>Appeal from the Newton Superior Court<br><br>The Honorable Daniel J. Molter, Judge<br><br>Trial Court Cause No.<br>56D01-1605-F5-13 |

**Brown, Judge.**

[1] Brian Keil appeals his convictions for two counts of unlawful possession of a syringe with a prior conviction, one as a level 5 felony and the other as a level 6 felony, and two counts of possession of paraphernalia as class C misdemeanors. Keil raises three issues which we revise and restate as:

I. Whether the trial court erred in not dismissing a juror;

II. Whether the court erred in admitting a recording taken from a law enforcement officer's body camera; and

III. Whether the evidence is sufficient to sustain his convictions.

We affirm.

*Facts and Procedural History*

[2] On May 3, 2016, Deputy David Rowe of the Newton County Sheriff's Office stopped at a convenience store in Newton County, Indiana, and went inside to talk to the clerk. Keil and Samuel Bass entered the store, Deputy Rowe immediately noticed that they appeared to be nodding as they were walking around and their eyes were glazed, and he believed they were under the influence of heroin. Deputy Rowe exited the store and observed a vehicle parked in a parking space near his fully-marked police vehicle and started to run the license plate. Bass exited the store and entered the driver's seat of the vehicle, Deputy Rowe asked Bass if he could speak with him, and Bass agreed.

[3] Deputy Rowe learned from the license plate check that the vehicle belonged to Bass and asked Bass for consent to search the vehicle. Keil then told Bass

"don't let him search your car," and Bass did not give consent to search. Transcript at 23. Deputy Rowe radioed New County dispatch and requested a K-9 officer for a search, and Deputy Sheriff Brian Runyon responded and conducted a free air sniff of Bass's vehicle. The dog alerted to the passenger side, and Bass told Deputy Rowe that there was a needle in the center console and that he had removed it from the passenger side door when he saw Deputy Rowe's police vehicle and placed it in the center console so that Deputy Rowe would not see it in plain view through the window. Bass stated that he had an addiction and that he and Keil had traveled to a small town in Illinois, purchased twenty dollars worth of heroin, and shared or used the heroin. Bass stated that he placed his syringe in the trash at the dealer's house and that the syringe in the center console belonged to Keil. Detective Rowe advised Keil of his *Miranda* rights and questioned him, and Keil "asked if there was any way to work it off." *Id.* at 26. Keil was searched, and a cigarette lighter and a black shoelace which had been tied into a loop at one end were discovered on Keil's person. A syringe, a spoon, and a small piece of packaging or baggie that was knotted were recovered from the center console of Bass's vehicle.

[4] The State charged Keil with: Count I, unlawful possession of syringe while having a prior conviction as a level 5 felony; Count II, possession of paraphernalia, a spoon, as a class C misdemeanor; Count III, unlawful possession of syringe as a level 6 felony; and Count IV, possession of paraphernalia, a shoelace, as a class C misdemeanor. At Keil's jury trial, Deputy Rowe testified regarding his experience in dealing with heroin, that

heroin is a depressant that causes the user to "want to nod out," and that it causes one "to have slurred speech, kinda lethargic type, so it's pretty much you're almost walking around sleeping if you will, it causes your eyes to be heavy." *Id.* at 16. He testified that there are several methods of introducing heroin into one's body including using a hypodermic needle, that heroin comes in a powder or types of a powder rock form, a user will convert the powder to a form by placing the powder and water or a liquid base in a spoon and heating it using a lighter, the user will use a needle to extract the liquid from the spoon, and then, in order for the user's veins to protrude, the user will commonly use a shoelace to tie off so the person can have a good injection site and inject the heroin.

[5] When asked what "any way to work it off" meant, Deputy Rowe testified "drug users often know if they have information that we need," "we have to rely upon users a lot for intelligence and to understand the knowhow of what's going on in the drug world," "that simply means that he's asking if there's a way for him to work it off," and "[t]hat could be a threshold of things from just giving me intelligence to making purchases for me or whatever to make the charge go away or receive leniency from the prosecutor." *Id.* at 26. When asked if, based on his training and experience, the lighter and the shoelace were used to inject heroin, Deputy Rowe answered "[y]es, they were," and when asked if he found "it uncommon for someone to carry a random shoelace that's been knotted at one end around in their pocket," he answered affirmatively. *Id.* at 28. With respect to the small piece of packaging or baggie recovered from the center

console of Bass's vehicle, he stated that "[m]ost oftentimes when you buy a drug, especially in powder form, they are going to twist it and they are going to make a small knot at the end to keep it inside the baggie" and "oftentimes when we find pieces of a baggie like that on a user, it's from them pulling it off, that knot, to open up the bag for usage." *Id.* Deputy Rowe also indicated that the spoon "wasn't clean" and "was a used spoon." *Id.* at 29. Before the State presented Bass's testimony, a juror informed the court that she knew Bass, the court questioned the juror outside the presence of the other jurors, and the juror was not removed from the jury. The court admitted into evidence a portion of a recording taken from Deputy Rowe's body camera.

[6] The jury found Keil guilty as charged under Counts II, III, and IV, and afterwards Keil pled guilty to Count I. The court sentenced Keil to five years on Count I, sixty days on Count II, eighteen months on Count III, and sixty days on Count IV, to be served concurrently for an aggregate term of five years. It recommended purposeful incarceration and advised Keil that upon successful completion of a therapeutic community program, it may consider sentence modification.

## *Discussion*

## I.

[7] The first issue is whether the trial court erred in not *sua sponte* dismissing a juror. During Keil's trial, Juror No. 1 told the court that she knew Bass, and the court

excused the remaining members of the jury.  The following exchange then occurred:

> The Court:  We're going to put you under the hot lights here. You'll need to come over here and sit by the mic because we have to record your testimony.  Let the record reflect that . . . Juror No. 1, has indicated she is personally acquainted with Sam Bass, the next witness called by the State of Indiana.  Would you share with us your acquaintance?
>
> Juror No. 1:  [Bass] was a student in my class a number of years ago.  I don't know how long ago that was and I have seen him at least once after that just to catch up.  I ran into him at a gas station and asked how things were going.  And with his name coming up, I thought it's not going to make any difference because he's not involved but he's actually here.
>
> The Court:  Just the fact that you're acquainted doesn't mean anything.
>
> Juror No. 1:  Okay.  I just wanted to make sure that everybody knew that.
>
> The Court:  You haven't had an experience or something that would keep you from listening?
>
> Juror No. 1:  No, no.  I did notice the last time I saw him that he had lost an awful lot of weight and I was suspicious as to what he might have been up to.  And he said he was getting himself in shape and getting back on track and I went okay.
>
> The Court:  Just the fact that you know him –
>
> Juror No. 1:  That's fine.  I just didn't want to continue under pretense that mattered.
>
> [Prosecutor]:  I'm satisfied.
>
> The Court:  Any questions?

[Defense Counsel]: No questions, Your Honor.

The Court: It's fine. It's a small county; I guess you are bound to know people.

Transcript at 45.

[8] Keil asserts that he was unfairly prejudiced because the court did not dismiss Juror No. 1, that the court did not make sure that Juror No. 1 was able to remain impartial, that Juror No. 1's suspicion shows that the juror was not impartial, and that fundamental error occurred. The State responds that Keil did not request that Juror No. 1 be replaced with an alternate, that regardless there is little evidence showing a relationship between Juror No. 1 and Bass or suggesting any partiality, and that at most Juror No. 1 had a casual encounter with a person who was once a student of hers which is not enough to establish juror bias.

[9] A defendant is entitled to an impartial jury. *See* U.S. CONST. amend. VI; IND. CONST. art. I, § 13. Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will reverse such determinations only where we find them to be arbitrary, capricious or an abuse of discretion. *May v. State*, 716 N.E.2d 419, 421 (Ind. 1999) (citing *Harris v. State*, 659 N.E.2d 522, 525 (Ind. 1995)). The trial court is in the best position to assess the honesty and integrity of a juror and the juror's ability to perform as a conscientious, impartial juror. *Id.* (citing *Harris*, 659 N.E.2d at 525). This is especially true where the trial judge must weigh the nature and extent of a juror relationship with a party or witness established pre-trial and arising in the

normal, and often inevitable, course of interaction in an employment or community environment. *Id.* As such, our review of the trial court's decisions in these matters is highly deferential. *Id.*

[10] Keil did not object to Juror No. 1 remaining on the jury or request that the juror be removed, and as such he cannot now question the outcome based on the juror's participation. *See Barnes v. State*, 693 N.E.2d 520, 524 (Ind. 1998) (noting the defendant did not seek to excuse a juror for cause and holding that, having failed to challenge the juror at trial, the defendant "cannot now question the outcome based on her participation"). Waiver notwithstanding, we do not find Keil's argument to be persuasive. The trial court was in the best position to assess the honesty and integrity of Juror No. 1 and her ability to perform as a conscientious, impartial juror. The court could have reasonably interpreted Juror No. 1's comments as nothing more than a natural anxiety regarding her ability to separate past experience from present judgment. The juror indicated that she had not had an experience that would keep her from listening, and the court was able to weigh the nature and extent of her relationship and interactions with Bass prior to trial and arising in the normal course of an employment or community environment. Based upon the record, we cannot say the trial court abused its discretion, erred, committed fundamental error, or placed Keil in substantial peril when it did not remove Juror No. 1 from the jury. *See Harris*, 659 N.E.2d at 525-526.

The next issue is whether the trial court erred in admitting a portion of a recording taken from Deputy Rowe's body camera into evidence. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). We review its rulings for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.* However, we will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Generally, errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights. *Id.* at 1059. The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

A contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010), *reh'g denied*. A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. *Id.* The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Id.* The error claimed must either make a fair trial impossible or

constitute clearly blatant violations of basic and elementary principles of due process. *Id.* This exception is available only in egregious circumstances. *Id.*

[13] Keil argues that "[i]t was fundamental error for the trial court to admit an electronic disk, State's Exhibit 1, into evidence over [his] objections" and states "[d]efense objects to the publication of the materials on the cd, as he had believed the admission prior in the case was for purposes of the physical cd and not its contents." Appellant's Brief at 14-15. The State responds that Keil has waived his argument because he did not object to the admission of the exhibit when it was introduced and does not argue or present cogent argument that the court committed fundamental error. It also states it "cannot identify any basis for challenging the admission of the video in whole and [Keil] has never dissected the video to request the redaction of limited parts," that Keil has failed to show that it was fundamental error to admit the video, and that any error in its admission was harmless as Deputy Rowe testified as to most of the conversation on the recording. Appellee's Brief at 23.

[14] Keil filed a motion *in limine* asking in part that the court instruct the State not to refer to his alleged prior convictions, and the court ordered the State to refrain from introducing evidence of Keil's prior convictions in the first phase of the trial. During his testimony, Deputy Rowe indicated that his encounter with Keil was recorded on his body camera, that he had viewed the footage, and that copies of the footage had been made. The State identified State's Exhibit 1, and Deputy Rowe indicated it was a copy of the footage and that his initials were on the disk. The State moved to admit Plaintiff's Exhibit 1 into evidence, Keil's

counsel stated "[n]o objection," and the court admitted the exhibit into evidence. *Id.* at 24.

[15] Later, when the State was ready to present the testimony of Bass, the prosecutor stated:

> Judge, briefly before the jury comes in, my intent during this examination of the witness would be to present the video that we have previously entered into evidence. And in publishing that video to the jury, I want to advise the Court that the video exists in three different files, three separate consecutive files. And I only intend to present the third file because there are mentions of Mr. Keil's history in some of those files so I don't want to muddy the water with the first two files. The third file basically contains Mr. Bass' interview with Detective Rowe at the scene. And there is one statement that Detective Rowe says in the beginning of that interview that "I know Brian," the Defendant, "I know him." That's all that's said, he doesn't say how he knows him but I want to put that on the record because I don't want any chance of that throwing it in the face of the motion in limine as to the Defendant's prior convictions. I don't believe it does and I wanted to make the Court aware of it and defense counsel I'm sure will have something to say about that.

*Id.* at 46. Keil's counsel objected to the publication of the video to the jury and argued that it violated Ind. Evidence Rule 403[1], stating "[w]e don't have any objection to the video itself, we just object to the publication to the jury," the

---

[1] Ind. Evidence Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

court asked "[w]hat else would you do with it," and Keil's counsel stated "I saw no need to object to that because we were not publishing to the jury at that time" and "[w]hat I have a problem with now is that we do feel it's an unfair prejudice and it shouldn't be published to the jury." *Id.* at 47.

[16] The court replied "I believe you've waived that issue," "[b]ut regardless, I will clean it up in the record and I will allow you to publish it," and "for the record, State's Exhibit 1 is being published only with regard to the third file only and should the jury request – and this exhibit will not accompany the jury to the jury room and can only be viewed in the presence of the Court and counsel for the record should they request an opportunity to review this." *Id.* The prosecutor then stated "again, as far as the statements as to [Keil's] history by Detective Rowe, at the beginning of that file there is a statement 'I know Brian,'" "[t]owards the end there are statements made by [Keil] which I believe are not hearsay and are party admissions," and "Detective Rowe says towards the end when he's talking to [Keil] that, 'We've tried that before,' speaking of he's had dealings with [Keil] in the past and he's not willing to work with him now. I do not wish to play those. He's testified to it, I want to leave it at that." *Id.* at 47-48. The court asked "[i]s that in the third file," the prosecutor replied it "is at the end of the third file," the court then asked "[s]o you know when to stop that," and the prosecutor replied "I can stop that." *Id.* at 48. The court then stated: "Very good. Just so the record is straight with regard to the first stage of the proceedings, in the event the jury wishes to review this document, it

would have to be in the presence of the Court and counsel and only with regard to file three and after the extraction of — or redaction of the one portion." *Id.*

[17] The State called Bass as its next witness. After several preliminary questions, the prosecutor stated "I think now would be a good time to play the video and publish it to the Jury." *Id.* at 49. The transcript at this point indicates: "(The playing of State's Exhibit 1, video statement of Samuel Bass, is transcribed as follows:)." *Id.* The transcript of the video indicates that, at one point near the beginning of the portion of the video played, Deputy Rowe stated to Bass: "[Keil] knows this game, okay. He knows me and if he wants to play like that and not take or accept responsibility that's on him but it's your car. . . ." *Id.* at 50. No objection was lodged.

[18] The record reveals that Keil's counsel stated that Keil had no objection to the admission of State's Exhibit 1 and the court admitted the exhibit. His later objection to publication is waived. On appeal he asserts that it was fundamental error to admit the body camera footage, stating "[t]o disallow the Defendant to argue his objection was an abuse of discretion that unfairly prejudiced the Defendant." Appellant's Brief at 15. He does not present cogent argument, and his claim is waived. *See Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument).

[19] Waiver notwithstanding, we cannot say that the probative value of the evidence of the portion of the video played for the jury was substantially outweighed by

the danger of unfair prejudice to Keil. Further, even if the court abused its discretion in admitting the recording, any such error is harmless. The State elicited testimony from Deputy Rowe regarding his conversations with Bass and Keil, his observations of Keil, and the location of the discovery of the syringe, spoon, and a knotted portion of a baggie in the vehicle, as well as the lighter and shoelace tied into a loop at one end on Keil's person. The admission of the challenged recording is not grounds for reversal.

## III.

[20] The next issue is whether the evidence is sufficient to sustain Keil's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[21] Keil argues the evidence is insufficient to show his actual or constructive possession of the syringe beyond a reasonable doubt or to show he intended to use the needle, spoon, or shoestring to introduce a controlled substance into one's body. The State contends that it proved beyond a reasonable doubt that Keil possessed a syringe and paraphernalia with the requisite intent and that Keil had both actual and constructive possession of the syringe and other items.

[22] Ind. Code § 16-42-19-18 provides "[a] person may not possess with intent to: (1) violate this chapter [the Indiana Legend Drug Act]; or (2) commit an offense described in IC 35-48-4; a hypodermic syringe or needle or an instrument adapted for the use of a controlled substance or legend drug by injection in a human being." Ind. Code §§ 35-48-4 govern offenses relating to controlled substances. Ind. Code § 35-48-4-8.3(b)(1) provides in part that a person "who knowingly or intentionally possesses an instrument, a device, or another object that the person intends to use for: (1) introducing into the person's body a controlled substance; (2) testing the strength, effectiveness, or purity of a controlled substance; or (3) enhancing the effect of a controlled substance" commits a class C misdemeanor. Keil does not challenge his admission that he had a prior conviction supporting his level 5 felony under Count I.

[23] A conviction for possession of contraband may rest upon proof of either actual or constructive possession. *Washington v. State*, 902 N.E.2d 280, 288 (Ind. Ct. App. 2009), *trans. denied*. Constructive possession occurs when the defendant has actual knowledge of the presence and illegal character of the contraband and the capability and intent to maintain dominion and control over it. *Id.* To prove capability, the State must demonstrate that the defendant is able to reduce the contraband to his personal possession. *K.F. v. State*, 961 N.E.2d 501, 510 (Ind. Ct. App. 2012), *trans. denied*. To prove intent, the State must demonstrate the defendant's knowledge of the presence of the contraband. *Id.* This knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive,

evidence of additional circumstances that point to the defendant's knowledge of the presence of the contraband. *Id*. These additional circumstances may include incriminating statements by the defendant, flight or furtive gestures, the defendant's proximity to the contraband, the contraband being in plain view, or the location of the contraband in close proximity to items owned by the defendant. *Id*.

[24] The evidence most favorable to Keil's conviction reveals that Bass told Deputy Rowe that he and Keil had purchased and used twenty dollars of heroin, that he had moved a syringe from the passenger door to the center console so that Deputy Rowe would not see it, and that the syringe belonged to Keil. The police dog alerted to the passenger side door of Bass's vehicle, and the syringe was discovered in the center console together with a used spoon and a knotted portion of a baggie. Further, a lighter and shoelace tied into a loop at one end were discovered on Keil's person. Deputy Rowe also indicated that he believed Keil was under the influence of heroin based on his behavior, and Keil asked Deputy Rowe "if there was any way to work it off." Transcript at 26. The trier of fact could reasonably infer that Keil had knowledge of the contraband as well as the capability and intent to maintain control over it. Further, the trier of fact could reasonably conclude that Keil possessed the syringe with the intent to use it to inject heroin.

[25] Based upon the record, we conclude that evidence of probative value was presented from which the jury could find beyond a reasonable doubt that Keil committed the offenses of unlawful possession of a syringe and possession of

paraphernalia. *See Cherry v. State*, 971 N.E.2d 726, 732 (Ind. Ct. App. 2012) (holding the jury was entitled to conclude that the defendant possessed the syringe with the intent to use it to inject heroin), *trans. denied*.

## *Conclusion*

For the foregoing reasons, we affirm Keil's convictions.

Affirmed.

Najam, J., and Kirsch, J., concur.