# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J. T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

**FILED**

Dec 10 2014, 9:29 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | | |
|---|---|---|
| PAUL PHILLIPS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1402-CR-86 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marc Rothenberg, Judge
Cause No. 49G02-1302-FA-9107

**December 10, 2014**

**OPINION - FOR PUBLICATION**

**BARTEAU, Senior Judge**

## STATEMENT OF THE CASE

Paul Phillips appeals from his conviction after a jury trial of one count of child molesting[1] as a Class A felony. We affirm.

## ISSUES

Phillips presents the following issues for our review:

I.      Whether the trial court denied Phillips the right to an impartial jury and a fair trial under the federal and state constitutions by denying Phillips's motion for mistrial and motion to replace a juror after a juror asked a question, instead choosing to offer a curative instruction.

II.     Whether the prosecutor engaged in prosecutorial misconduct amounting to fundamental error during closing argument.

III.    Whether the trial court erred by instructing the jury about voluntary intoxication.

## FACTS AND PROCEDURAL HISTORY

E.C., who lives with his mother, I.C., his father, J.C., and his brother, M.C., has known Penny Phillips and her husband, Paul, for a long time. I.C. had met Penny approximately one year before E.C. was born and the two families were close. Penny and Phillips frequently would babysit E.C. and M.C. while I.C. was working ten-hour shifts six days a week. Additionally, E.C. and his family visited Penny and Phillips at least once a week. E.C. and his brother viewed Penny and Phillips as grandparents, referring to them as Mamaw and Papaw. During his visits with Penny and Phillips, E.C. would go into their bedroom to watch cartoons, having done so since he was a toddler in diapers.

I.C.'s sister, Stacy, lived in a house near Penny and Phillips's home. On February

---

[1] Ind. Code § 35-42-4-3 (2007).

2

7, 2013, when E.C. was eight years old, and when Stacy was pregnant, I.C. stopped by Penny and Phillips's house with her children, so they could watch the children while I.C. checked on her sister's well-being. On that particular day, I.C. made several trips between houses until Stacy returned home from the hospital. M.C. went with his mother to check on Stacy while E.C. stayed with Penny and Phillips.

When E.C. went to Phillips's bedroom to watch cartoons, Phillips was already in the room lying down, but was awake. E.C. subsequently described the following events that occurred while E.C. was in Phillips's bedroom on that occasion. Phillips kissed E.C. on the mouth and the kiss was "inside" E.C.'s mouth. Tr. p. 54. Phillips touched E.C. on E.C.'s "pee pee" and on his "butt." Id. at 57-58. E.C. also said that Phillips forced him to touch Phillips's "pee pee" with E.C.'s hand. Id. at 60-61. Philips touched the inside of E.C.'s mouth with Phillips's "pee pee" and told E.C. to touch Phillips's "pee pee" with E.C.'s mouth. Id. at 53-54, 59. E.C. further stated that Phillips touched E.C.'s "butt" with Phillips's "pee pee." Id. at 57-59.

I.C. and M.C. had been gone about fifteen to twenty minutes to visit Stacy when Penny opened the closed door and walked into the bedroom where she observed that E.C. was performing oral sex on Phillips. Penny saw both E.C. and Phillips on the bed with Phillips lying on his side and E.C. under a blanket with his head down on Phillips's penis. Penny further observed that Phillips was awake and he sat up when she entered. In a state of disbelief over what she had seen, Penny became upset and began to cry. When she asked Phillips and E.C. what they were doing, Phillips replied that they were playing hide and seek, and covered himself with the blanket. Penny told E.C. to come out from under the

3

blanket, and she asked him what was happening. E.C., who had been instructed to mimic Phillips's responses, said to her that "Paul made me play hide to go seek." Id. at 62.

Penny asked Phillips more than once to walk over toward her because she wanted to see if his pants were on. When Phillips ultimately stood up, his genitalia were completely out of his pants, which were unbuttoned and unzipped. Penny asked Phillips to walk with her to the bathroom nearby and demanded that Phillips show her his penis. Phillips's penis was wet because E.C. had been licking it. When Penny asked Phillips why his pants were unfastened, he denied that they were undone. At that point Penny was confused, nervous, and scared.

Penny directed E.C. to go to the front room with her, and made him sit near her. When she again asked E.C. what had happened, he would not speak about it. Penny then asked Phillips "why did you do this?" Id. p. 94. Phillips responded that E.C. had kissed him first, to which Penny replied that Phillips was the adult in that situation. Phillips asked Penny not to call the police, but she did so nonetheless. She called 911 twice, placing the second call after Phillips had left the house.

Indianapolis Metropolitan Police Officers Matthew Coffey, Seth Ferrell, and Matthew Cook responded to the dispatch reporting child molestation. Officer Coffey went directly to Penny's home at 50 South Colorado in response to the call while Officers Ferrell and Cook drove to the area to search for Phillips, who had left the house.

Officer Coffey observed E.C., who looked confused and embarrassed, and spoke with Penny, who was upset and crying. Penny told Officer Coffey that she had walked in on Phillips who was doing inappropriate things with a boy in the house. Penny gave a

4

description of Phillips to Officer Coffey, who communicated that description over the police radio.

Officers Ferrell and Cook were told that Phillips was running west-bound on railroad tracks near Sherman Drive. After receiving the description of Phillips, Officers Ferrell and Cook were able to locate Phillips, who was walking quickly into traffic approximately half of a mile from his house. When Officer Ferrell apprehended Phillips, Phillips voluntarily stated "it wasn't me, I'm not the guy, you got the wrong guy." Id. at 187. After the officers handcuffed Phillips, he requested an ambulance and was transported to Wishard Hospital.

Officer Coffey chose not to interview E.C. because he wanted to wait for a detective to arrive and conduct that part of the investigation. When I.C. returned to Penny's house she observed that both Penny and E.C. were crying and that E.C. seemed upset and confused. I.C. spoke with officers there at the house and took E.C. to the Peyton Manning Children's Hospital, where she gave permission to the forensic and sexual assault nurse examiners to examine E.C.

Indiana Metropolitan Police Officer Robert Chappell, a sex crimes child abuse detective, began the investigation. Detective Chappell observed that E.C. was nervous and fidgety during the interview, and Penny, who had been transported to the location of the interview, appeared to be shaken, nervous, upset, red-faced and animated. Detective Christopher Lawrence also participated in the investigation. The two officers called Christine Ondek, a crime scene investigator, who helped to photograph, diagram, and collect evidence in the case. The officers also obtained search warrants for Phillips's house

and person. They executed the warrants, collected bedding from the scene of the molestation, and with the assistance of hospital medical staff, collected swabs and DNA samples from both E.C. and Phillips.

Forensic nurse examiner Elizabeth Kleeman collected Phillips's clothing and took swabs from Phillips's mouth, hands, and penis pursuant to the search warrant. Sexual Assault Nurse Examiner Patrisha Anderson examined E.C. and conducted a chart review of his examination conducted by another nurse. That examination was invasive and lengthy beginning at 12:30 a.m. and ending at 3:40 a.m. During the examination, a blue light fluorescence test was positive for the presence of biologic material on E.C.'s clothing. Nurses took swabbed samples from E.C.'s anal and genital areas. Sexual Assault Nurse Examiner Anderson noted redness in E.C.'s anal area.

The samples collected from both E.C. and Phillips were sent to the crime lab for testing and analysis. Penile swabs taken from Phillips tested positive for seminal material. E.C.'s DNA was also found on Phillips's penile swab and on the inside of Phillips's jeans.

The State charged Phillips with two counts of child molesting as a Class A felony, one count of child molesting as a Class C felony, and one count of child solicitation as a Class D felony. At the conclusion of Phillips's jury trial, the jury found Phillips guilty on all counts. The trial court sentenced Phillips to a term of forty-two years, with five years suspended to probation, for one of the Class A felony counts, and vacated the remaining convictions due to double jeopardy concerns. Phillips now appeals. Additional facts will be supplied as needed.

## DISCUSSION AND DECISION

## I. JUROR QUESTION

Phillips claims that his conviction should be reversed and the matter remanded for a new trial because he was denied his federal and state constitutional rights to a fair trial. Phillips argues that the trial court erred by failing to allow him to question a juror about his or her potential bias after a juror asked a question Phillips contends revealed his or her potential bias against him. Phillips claims that the question established that the juror failed to reserve judgment about the case until deliberations and that the trial court consequently abused its discretion by denying his motion for mistrial. We address each of these contentions in turn.

Indiana Trial Rule 47(B) provides in pertinent part as follows:

Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties.

"Specifically, a number of cases have given trial courts significant leeway under Indiana Trial Rule 47(B) in determining whether to replace a juror with an alternate, and reverse only for an abuse of discretion." *Riggs v. State*, 809 N.E.2d 322, 327 (Ind. 2004). "These cases deal with removal of a prospective juror from a panel, or removal as a result of developments during the trial." *Id*.

During the trial, but prior to deliberations, and at the conclusion of E.C.'s testimony, a juror sent a question to the trial court, which reads in pertinent part as follows:

Question about [E.C.]: My concern for him is the long-term effects on him of implicating someone he has been so close to—that telling the truth has hurt someone who has been like a grandfather to him—Does the court ever order counseling for children in situations like this?

7

Court's Ex. 1, Ex. Vol. p. 54. The trial court read the question to the parties outside the presence of the jury and initially stated that no response was required. Phillips asked the trial court to identify the juror in order to question him or her about whether he or she had already reached a decision as to Phillips's guilt or innocence. The trial court disagreed with Phillips's contention that the question suggested that the juror had reached a final determination about Phillips's guilt or innocence. Phillips argued that the phrase "that telling the truth has hurt someone…." suggested a bias in favor of conviction.

The trial court stated that a juror can find a witness to be credible or not at the time of their testimony without disregarding the instruction to withhold judgment until final deliberation. The trial court further stated that this particular juror's question, in the trial court's opinion, did not present the issue of outcome determination. The trial court acknowledged that had the question contained a definitive statement of guilt or an indication of premature outcome determination, then Phillips would have been entitled to have the juror identified and questioned. Ultimately, the trial court concluded that to question the juror would be akin to polling the jury prior to reaching the verdict, giving the parties a preview of how the case was proceeding. Instead, the trial court repeated the jury instructions including the instruction informing the jury not to reach a conclusion on guilt or innocence until all the evidence was presented and deliberations commenced. Phillips's motion for a mistrial, which was made to preserve the objection, was denied by the trial court.

Under federal constitutional analysis governing the exclusion of a juror due to bias, the "standard is whether the juror's views would 'prevent or substantially impair the

8

performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). Here, the trial court instructed the jurors that they were the exclusive judges of the evidence, that they were to determine which witnesses to believe or disbelieve, that they could choose to believe all, part, or none of a witness's testimony, and that they should attempt to fit the evidence to the presumption that the defendant is innocent and that every witness is telling the truth. The question posed by the juror had more to do with what happened to E.C. after the trial regardless of the verdict reached. The juror used the word "implicate," which reveals no bias in favor of guilt or innocence. Further, the question presented by the juror reflects that the juror was following the trial court's instructions; therefore, Phillips has revealed no basis for removing the juror under federal constitutional analysis.[2]

Phillips also raises a state constitutional claim based upon an alleged violation of his right to a public trial by an impartial jury. *See* Ind. Const. art. I, §13. "Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will only reverse such determinations where we find them to be arbitrary, capricious or an abuse of discretion." *Morgan v. State*, 903 N.E.2d 1010, 1018-19 (Ind. Ct. App. 2009) (quoting *May v. State*, 716 N.E.2d 418, 421 (Ind. 1999)), *trans. denied*. Many of the cases evaluating requests to replace a juror with an alternate involve allegations of juror

---

[2] Phillips cites to an unreported opinion from the United States District Court Southern Division of Michigan as support for his position about the right to a fair trial and juror questions. *See Gaither v. Birkett*, 2006 WL 1547636 (S.D. Mich. 2006). This unreported opinion has no precedential value and its persuasive effect actually weighs in favor of the State's position on this issue. The court found that cautionary instructions cured any misconceptions the jurors might have had about the law as reflected by questions that were challenged by the petitioner as reflecting a bias against the petitioner.

misconduct in the context of out-of-court communications with unauthorized persons. *See e.g.*, *May v. State*, 716 N.E.2d 419 (Ind. 1999); *Morgan v. State*, 903 N.E.2d 1010 (Ind. Ct. App. 2009), *trans. denied*. Such is not the case here, but the review applied to the trial court's decision in those situations is helpful to the resolution of the issue presented here.

"Typically, '[t]he trial court [is] in the best position to assess the honesty and integrity of [a juror and their] ability to perform as a conscientious, impartial juror.'" *Morgan*, 903 N.E.2d at 1019 (quoting *Harris v. State*, 659 N.E.2d 522, 525 (Ind. 1995)), *trans. denied*. "'As such, our review of the trial court's decisions in these matters is highly deferential.'" *Id.* Additionally, we begin with the presumption that the jury follows the trial court's instructions. *Harris v. State*, 824 N.E.2d 432, 440 (Ind. Ct. App. 2005). As we explained with respect to federal constitutional analysis, the juror's question reflected that the juror was following the trial court's instructions and had not prematurely reached a final determination of Phillips's innocence or guilt. The trial court's decision to allow the juror to remain on the panel was not an abuse of discretion.

Likewise, the trial court's refusal to identify the juror and allow questioning of that juror was not an abuse of discretion under state constitutional analysis. The juror's question did not indicate a bias in favor of or against a particular verdict. To further question the juror would, as the trial court noted, be akin to polling the jury during the trial, thus giving counsel a preview of the progress in the case. "[O]nce deliberations begin, discharge of a juror is warranted only in the most extreme situations where it can be shown that the removal of the juror is necessary for the integrity of the process, does not prejudice the deliberations of the rest of the panel, and does not impair the parties' right to a trial by

jury." *Leslie v. State*, 978 N.E.2d 486, 493 (Ind. Ct. App. 2012). Phillips has not demonstrated that by posing this particular question, removal of this juror was necessary for the integrity of the process. The trial court did not abuse its discretion by denying Phillips's request.

In order to preserve his objection to the trial court's decision to re-read the preliminary instructions, in lieu of identifying and questioning the juror, Phillips made a motion for mistrial. The trial court's decision to grant or deny a motion for a mistrial is within the discretion of the trial court, and its ruling is reviewed solely for an abuse of discretion. *Jackson v. State*, 925 N.E.2d 369, 373 (Ind. 2010). "'We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury.'" *Evans v. State*, 855 N.E.2d 378, 386 (Ind. Ct. App. 2006) (quoting *Kirby v. State*, 774 N.E.2d 523, 533-34 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied* (2007). In determining whether a mistrial is warranted, the relevant inquiry is whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id.*

The trial court's decision to deny Phillips's motion for mistrial was appropriate in this situation. The trial court reinforced the instructions that were previously given to the jury. The language of the juror's question reflected that he or she was already following those instructions. We find no abuse of discretion in the trial court's decision.

## II. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

Generally, in order to properly preserve a claim of prosecutorial misconduct for

appeal, a defendant must not only raise a contemporaneous objection, but he must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then he must request a mistrial. *Owens v. State*, 937 N.E.2d 880, 893 (Ind. Ct. App. 2010). Failure to request an admonishment or to move for mistrial results in waiver. *Id.* Phillips did not object to many of the claims of misconduct he raises on appeal and, therefore, did not properly preserve those claims. Phillips did object during the State's closing argument when the State pointed to Phillips while arguing that Phillips was trying to cover his tracks. That claim has been properly preserved and will be addressed under the appropriate standard of review.

> During closing argument, the prosecutor pointed at Phillips, arguing as follows:
>
> You knew what you were doing, Mr. Phillips. You started covering your tracks from the word go.

Tr. p. 458. Phillips objected to the State pointing at and accusing Phillips, contending that such was improper during final argument. The prosecutor apologized, contending that she was merely gesturing. As for the accusation, the evidence referred to by the prosecutor all supported the contention that Phillips had attempted to avoid responsibility for the crimes since the moment of Penny's discovery. The trial court warned the prosecutor to be cautious and allowed her to continue with her closing argument. Further, although not explicitly requested, an admonishment was given after Phillips objected. After that admonishment, Phillips did not object again on that ground and there is no claim that the prosecutor continued to point at Phillips. Therefore, the admonishment sufficiently cured the alleged error. Consequently, Phillips's argument on his only preserved claim of

12

prosecutorial misconduct does not establish that a reversal of his conviction is necessary.

In order to prevail on Phillips's remaining claims of prosecutorial misconduct, the claims must withstand review for fundamental error. To prevail on a claim of prosecutorial misconduct where the misconduct has not been properly preserved, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). In reviewing a claim of prosecutorial misconduct, we determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been subjected. *Nichols v. State*, 974 N.E.2d 531, 535 (Ind. Ct. App. 2012). We determine whether a prosecutor's argument constitutes misconduct by referring to case law and the Rules of Professional Conduct. *Id.* "'The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.'" *Id.* (quoting *Cooper*, 854 N.E.2d at 835).

"Fundamental error is an 'extremely narrow exception' to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue." *Id.* "For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must 'make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm.'" *Id.* (quoting *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002)).

First, Phillips argues that the State committed prosecutorial misconduct by improperly vouching for E.C.'s and Penny's credibility. In particular, during closing

argument, the prosecutor stated as follows:

> We know that E.C. is telling the truth. We know that. . . . There's simply no motive for E.C. to lie. He liked going over to Meemaw Penny's and Papaw Paul's and watching cartoons. Why would he make this up? What could he possibly gain from making this up, from going through not one invasive sexual assault exam but two? Nothing. Nothing. Because he's not making this up, ladies and gentlemen. And you saw Penny's emotions, those real emotions that came pouring out. This was hard on her. Her life as she'd known it for thirty years came crashing down in a single second and it's in the details, the things that she saw—his penis was wet—and the things that the defendant said to her—we were just playing hide and go seek, don't call the police, he kissed me first. The disbelief still today in her eyes, not wanting to believe that this is true, not wanting to believe, but knowing— what she saw. Those details are real. That 911 call, both 911 calls, those are real. Those are real. She has no motive to lie, ladies and gentlemen. No motive. . . . But E.C.'s DNA is on Paul Phillips'[s] penis and it's in Paul Phillips'[s] blue jeans that he was wearing that night. And it's there because Paul Phillips made E.C. lick his pee pee and because Paul Phillips inserted his penis into E.C.'s anus. This is how we know that E.C. and Penny Phillips are telling the truth.

Tr. pp. 455-57.

A prosecutor may not personally vouch for a witness. *Schlomer v. State*, 580 N.E.2d 950, 957 (Ind. 1991); Ind. Professional Conduct Rule 3.4(e). "But a prosecutor *may* 'comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence.'" *Ryan v. State*, 9 N.E.3d 663, 671 (Ind. 2014) (emphasis in original) (quoting *Lopez v. State*, 527 N.E.2d 1119, 1127 (Ind. 1988)).

Here, the prosecutor connected her commentary on E.C.'s and Penny's credibility with evidence in the record that supported the testimony. While we agree that the State should not vouch for a witness, the facts here do not amount to prosecutorial misconduct, and thus, do not constitute fundamental error.

Phillips also contends that the following excerpt from the State's rebuttal closing

14

argument, to which no objection was made, establishes prosecutorial misconduct amounting to fundamental error:

> But there's circumstantial evidence and I think what—the fact—a fact that I found to be probative or important, I hope you do too, is what [t]he nurse testified to about E.C. and his demeanor and how he reacted during the exam. She recalled—she told you that she tells the patient how she would like them to be on the table so that she can perform her exam and that E.C. would not get on his knees and stick his butt in the air. He was not going to do that again. Why do you think that is? Why do you think E.C. was not about to put himself in that position again? Because E.C. had found out the day previous what happened when you stuck your bare butt in the air to an adult. And now forever that is what will be with him, thanks to Mr. Phillips.

Tr. pp. 466-67. Phillips claims that the evidence does not support the interpretation advanced by the State.

When placed in context, the State's rebuttal closing argument is in response to the following excerpt of Phillips's closing argument regarding the sexual assault exam testimony:

> I had [E.C.] come down to my office and took his statement called a deposition. A representative from the State was there. Initially he denied anything ever happened. Only after some prodding did he ever say anything happened. He kept telling the prosecutor that he was annoying. He obviously was embarrassed. Now why was he embarrassed? Well, that should be obvious. Did he think that he had done something wrong? Does he have homosexual tendencies at a young age? That's something that we don't know. But is it possible? Yes. Is homosexuality, innate, something that you discover as you're growing up? Possibly. Is that what happened here? Could have. Now we do know that during the physical examination there was absolutely no evidence whatsoever of any anal tears or –the DNA examination, we know that there was absolutely no evidence of any DNA in that area of the body. There's a very good chance I think that it shows that he was lying about that, that that certainly never happened. In fact, the only evidence that it did happen is his own statement.

Tr. pp. 460-61. Thus, the portion of the State's rebuttal closing argument at issue here was

15

a permissible response to Phillips's characterization of the evidence during closing argument. We find no fundamental error here.

While the criminal charges were pending against Phillips, he wrote a postcard to his neighbor, but mailed the postcard to his home address. The State offered the postcard at trial and it was admitted in evidence. In the post card, Phillips described seeing Penny and I.C. recently in court and experiencing the animosity directed at him. Phillips claimed that Penny had intentionally sent E.C. into Phillips's bedroom to set him up and claimed that E.C. was the instigator of the sexual act Penny saw. He further stated that he had passed out in the bedroom after taking some Xanax and Vicodin that he claimed I.C. had purchased for him. Phillips used derogatory language to describe E.C.

Phillips also challenges the State's rebuttal closing argument that Phillips had seen the DNA report prior to writing the postcard to his neighbor and testifying at trial, and that E.C., on the other hand, had seen none of the evidence prior to testifying. The State did present an argument along those lines during rebuttal closing argument. However, other than mentioning those references, Phillips has failed to present an argument specifically addressing those comments. Waiver notwithstanding, Phillips has not demonstrated fundamental error here. The State is permitted to comment on the credibility of the witnesses as long as the assertions made arise from the evidence. Phillips was in the courtroom and heard all of the evidence presented before taking the stand. E.C., on the other hand, was the State's first witness and testified without knowing how other witnesses would testify.

Phillips also attacks the State's "plug" for the public servants who were involved in

16

the investigation of this matter. Id. at 470. Phillips also contends that the State improperly pleaded for the jury to render a verdict in support of E.C.'s cause. The State's compliments to those who were involved in the investigation of the case were gratuitous and do not rise to the level of prosecutorial misconduct. However, Phillips is correct in his challenge of the State's plea to the jury to further support E.C.'s cause for justice by rendering a guilty verdict. The State's argument here does cross the line into prosecutorial misconduct in the rebuttal closing argument.

Nevertheless, Phillips failed to object to the argument. Thus, we must review those comments for fundamental error. The State's comments, while improper, did not place Phillips in a position of grave peril to which he would not have been subjected. Unlike other cases where the issue turns solely on the credibility of the witnesses, E.C.'s testimony was corroborated and supported by forensic evidence. The probable persuasive effect of the State's plea on the jury's decision in this case is minimal. Therefore, we find no fundamental error on this claim.

### III. VOLUNTARY INTOXICATION INSTRUCTION

On appeal, Phillips alleges instructional error in the giving of the voluntary intoxication instruction, contending that he did not raise the defense and that there was no evidence to support giving the instruction. Our standard of review upon claims of instructional error is well settled:

> The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. In reviewing a trial court's decision to give a tendered jury instruction, we consider (1) whether the instruction correctly states the law, (2) is supported by the evidence in

17

the record, and (3) is not covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse only when the instructions amount to an abuse of discretion. To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. We will consider jury instructions as a whole and in reference to each other, not in isolation.

*Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010) (quoting *Murray v. State*, 798

N.E.2d 895, 899-900 (Ind. Ct. App. 2003)).

The trial court gave the following final instruction on voluntary intoxication to the

jury:

Voluntary Intoxication is not a defense to a criminal charge. You may not take voluntary intoxication into consideration in determining whether the Defendant acted intentionally as alleged in the charging information.

Appellant's App. p. 119. At the time the trial court announced that a ruling had been made

regarding that instruction, Phillips stated that he had no objection to the final instructions,

except the objection already noted. Earlier, Phillips had argued that the proposed

instruction on voluntary intoxication was objectionable because in place of the words

"criminal charge" the proposed instruction said "child molesting." Tr. p. 399. The trial

court agreed to change the instruction to read as it was given, replacing "child molesting"

with "criminal charge."

"When objecting to an instruction, the objection at trial must be sufficiently clear

and specific to inform the trial court of the claimed error, identifying both the claimed

objectionable matter and the grounds for the objection." *Childers v. State*, 719 N.E.2d

1227, 1231 (Ind. 1999). In fact, Indiana Trial Rule 51(C) requires the parties to identify

the specific objection to the instruction in part to provide the trial court the opportunity to

correct an instructional error, if any. *Id*. at 1232. Here, the trial court arguably preserved Phillips's objection to the instruction by noting that the instruction had been previously challenged. However, the previous grounds for the objection had been cured by changing the language of the instruction. Now, Phillips raises different grounds for the alleged error. An argument is waived where the appellant presents one argument at trial and raises a different argument on appeal. *Marshall v. State*, 621 N.E.2d 308, 314 (Ind. 1993).

Waiver notwithstanding, we address Phillips's concerns, ultimately concluding that there was no instructional error. Our Supreme Court has outlined the standard trial courts are to use when determining whether to give the voluntary intoxication instruction as follows:

> When the prosecution requests the instruction it seeks to avoid acquittal on the basis of evidence of simple voluntary consumption of alcohol. When the defense requests the instruction it seeks to achieve acquittal by insuring consideration by the jury of evidence of intoxication. In either case the question for the court is whether there is an adequate evidentiary basis for it. That basis exists where the evidence of intoxication, if believed, is such that it could create a reasonable doubt in the mind of a rational trier of fact that the accused entertained the requisite specific intent. If it could do so the refusal of the instruction is error.

*Hubbard v. State*, 469 N.E.2d 740, 742 (Ind. 1984) (quoting *Williams v. State*, 273 Ind. 105, 108-09, 402 N.E.2d 954, 956 (1980)).

Here, State's Exhibit 3, a postcard written by Phillips to his next door neighbor, was admitted into evidence. In the postcard, Phillips discussed the allegations against him, claiming that E.C. was the instigator, and that Phillips was "passed out on [Xanax] and [Vicodin]." He further claims that Penny sent E.C. into the room while Phillips was passed out, and that Phillips awoke to hear Penny yelling at him, and to observe that E.C.'s head

was under the covers. If believed, this evidence could create a reasonable doubt in the minds of the jury about the requisite specific intent. As *Hubbard* and *Williams* make clear, which party requests the instruction is irrelevant to the determination of whether the instruction should be given. Instead, the trial court must focus on the evidentiary basis. We conclude that there was sufficient evidence to support the trial court's decision to give the voluntary intoxication instruction. The trial court did not abuse its discretion.

CONCLUSION

In light of the above, we affirm the trial court's decision.

Affirmed.

BARNES, J., and MATHIAS, J., concur.