## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 14 2018, 10:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Adam C. Squiller
Squiller & Hamilton, LLP
Auburn, Indiana

Robert J. Hardy
Hardy Law Office
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Andrew M. Cassaday, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | March 14, 2018 <br><br> Court of Appeals Case No. 02A04-1706-CR-1437 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable John F. Surbeck, Jr., Judge <br><br> Trial Court Cause No. 02D05-1608-MR-4 |

**Kirsch, Judge.**

[1] Andrew M. Cassaday ("Cassaday") was convicted after a jury trial of murder,[1] a felony, and a sentencing enhancement for the use of a firearm in the commission of an offense[2] and was sentenced to an aggregate sentence of sixty-five years. Cassaday appeals his convictions, contending that the trial court erred when it instructed the jury regarding self-defense.

[2] We affirm.

## Facts and Procedural History

[3] During the summer of 2015, Jeffrey Lute ("Lute"), Justin Clark ("Clark"), Cassaday, Phil Elkins ("Elkins"), Brandon Briggs ("Briggs"), and other friends formed a motorcycle club called the Steel Horse Rebels. Elkins was appointed President, Lute was appointed Vice President, and Cassaday was appointed Sergeant at Arms. In December of 2015, the relationship between Lute and Elkins deteriorated, and the tension escalated to the point that Lute left the club along with his father and his best friend, Clark. Cassaday was subsequently made Vice President of the club. This tension between Lute and Elkins continued despite Lute leaving the club.

[4] On the evening of August 14, 2016, Lute and Clark went to the Texas Roadhouse restaurant located in Fort Wayne, Allen County, Indiana and met three other friends. Lute brought along and open carried his handgun as he

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 35-50-2-11.

usually did; he had a license to carry the handgun, and it was generally known that he carried it on his person. *Tr. Vol. I* at 62, 194; *Tr. Vol. III* at 3, 29, 90. The five friends ate dinner and had a good time. At around 8:26 p.m., one of the friends, Alma Hrmcic ("Hrmcic") recorded a Snapchat video of the group and posted it so her friends would be able to view it.

[5] At the same time, several members of the Steel Horse Rebels, including Elkins, were hanging out at another motorcycle club's clubhouse and became aware of the Snapchat video and the fact that Lute was at Texas Roadhouse. Cassaday was at his own residence with his girlfriend, Amanda Bovie ("Bovie"), when he received a phone call from Elkins. Immediately after receiving the phone call, Cassaday "drop[ped] everything," retrieved his handgun, which he was not licensed to carry, and left the house with Bovie. *Tr. Vol. I* at 72-73. Cassaday and Bovie then drove to the clubhouse and met the seven or so others who were gathered there.

[6] At the clubhouse, Elkins, who was friends with Hrmcic, viewed her Snapchat video and found out that Lute was at the restaurant.[3] Elkins then decided he would go to the restaurant to "chew [Lute's] ass" and said he was going there to confront Lute. *Tr. Vol. II* at 240. Cassaday decided that he would also go to the restaurant in order to give Lute his "two cents." *Tr. Vol. III* at 138, 140.

---

[3] It is not clear whether Elkins showed the Snapchat video to anyone else, but Bovie testified that, just before everyone left the clubhouse, Cassaday and other club members gathered around Elkins's cellphone and had a conversation about what they had viewed on it. *Tr. Vol. I* at 76-77.

Everyone at the clubhouse decided to drive over in their separate vehicles to the restaurant. At 9:16 p.m., Elkins sent a text message to Hrmcic, asking her whether she was still eating at the restaurant, and Hrmcic responded that she was.

[7] Just after 9:31 p.m., Lute and his friends finished eating dinner, paid their tabs, and left the restaurant. Lute and Clark headed through the parking lot to Clark's car, but before they could get in, ten to fourteen people "converged" on them and surrounded Lute. *Tr. Vol. I* at 82, 144, 192-93. Briggs approached Lute first and began yelling at him, acting aggressively, and stating, "what's up, Bitch, what's up, Pussy, are ya gonna pull a gun on me now." *Id*. at 193-94; *Tr. Vol. II* at 245-46. Lute took out his cell phone and held it up as if to take a video, and Briggs immediately stopped yelling at him and just stood there. *Tr. Vol. I* at 195, 233.

[8] Cassaday then approached Lute and started to attack him verbally and physically. Cassaday pushed Lute and "threw a punch at him," which may not have made contact. *Id*. at 249. Lute began retreating and walking backwards towards the sidewalk of the restaurant, and as Lute retreated, Elkins came running at full speed, which caused Lute to begin "backtracking a lot faster … almost [at] a run backwards." *Id*. at 197-98, 211. Elkins put his finger in Lute's face, bumped chests with Lute, and yelled and argued with Lute. Elkins also punched and shoved Lute multiple times. At one point, Lute stumbled over the curb but was able to regain his balance. Elkins persisted in acting aggressively

toward Lute, even after Lute told Elkins to stop, to leave him alone, and that he did not want any problems. *Id*. at 198; *Tr. Vol. II* at 10.

[9] Clark shouted to Lute, "defend yourself, … pull your gun if you have to." *Tr. Vol. I* at 198; *Tr. Vol. II* at 15. Lute then pulled out his handgun, and Elkins stated, "if you're gonna pull that gun you better fucking shoot and kill me." *Tr. Vol. I* at 199; *Tr. Vol. II* at 15-16. Elkins continued to move closer to Lute, and Lute again told him to stop and to leave him alone. *Tr. Vol. I* at 199; *Tr. Vol. II* at 8, 15, 188. Lute was backed up against the building and could not retreat further. Clark yelled to Lute, "shoot that motherfucker if you have to." *Tr. Vol. I* at 199; *Tr. Vol. II* at 15-16; *Tr. Vol. III* at 4, 37, 91. As Elkins "went to push [Lute] with his left hand," and "cocked his right arm to punch [Lute]," Lute pointed his handgun at Elkin's chest and then lowered it and shot him in the right leg. *Tr. Vol. I* at 199; *Tr. Vol. II* at 15-16; *Tr. Vol. III* at 4, 54-55. Elkins went down to the ground and screamed that Lute had shot him, to call 911, and for "somebody [to] go get him, somebody go kill that motherfucker." *Tr. Vol. I* at 199-200, 208.

[10] After shooting Elkins, Lute began retreating backwards saying, "good, call 911." *Id*. at 201. Then, Lute turned his back and retreated by running around the corner of the restaurant. Several of those present ran over to assist Elkins, and others chased after Lute. Briggs yelled to Cassaday that Elkins had been shot and that "[Lute's] coming around the building, somebody grab him, somebody get him." *Id*. at 201-02, 229; *Tr. Vol. II* at 38. Cassaday proceeded to quickly walk over to his vehicle and told Bovie to give him his gun. *Tr. Vol. I* at

85, 92, 111; *Tr. Vol. II* at 201; *Tr. Vol. III* at 94-96.[4] Bovie gave Cassaday his gun, and Cassaday then walked back toward the entrance of the restaurant.

[11] When Cassaday was about three or four feet away from the door, Lute came from around the corner of the restaurant. As soon as Lute turned the corner, Cassaday raised his handgun to shoulder level, paused for about one to two seconds to aim, and fired at Lute. *Tr. Vol. I* at 203-04; *Tr. Vol. II* at 39-40, 201-02. Lute fell to the ground when the bullet hit him in the neck, fracturing his spinal cord and killing him almost instantaneously. Cassaday stood for a second or two, looking over at Lute and then quickly returned to his vehicle, where he gave the handgun to Bovie. She placed the handgun in the glovebox. Cassaday drove through the parking lot quickly and picked up Elkins and other club members. Cassaday drove Elkins to the hospital, and on the way there, he told Bovie to tell the police that the handgun was hers.

[12] When Cassaday and the others arrived at the hospital, they were apprehended by the police almost immediately. The State charged Cassaday with murder, with Level 5 felony carrying a handgun with a prior conviction within the last fifteen years, and with a firearm sentencing enhancement. On August 26, 2016, Cassaday filed a notice of defense of justifiable reasonable force. *Appellant's App. Vol. II* at 167-68. Both the State and Cassaday filed proposed jury instruction with the trial court prior to trial. A jury trial was held from April 17

---

[4] At trial, a witness who was in the parking lot picking up his girlfriend from work, overheard someone say, "F [sic] this, I'm going to get my gun" and then saw Cassaday walk toward his car. *Tr. Vol. II* at 201.

through April 20, 2017, and at the conclusion, the jury found Cassaday guilty as charged. The State dismissed the Level 5 carrying a handgun charge, and Cassaday was sentenced to fifty-five years for murder with ten years for the firearm enhancement, which resulted in an aggregate sixty-five-year sentence. Cassaday now appeals.

## Discussion and Decision

[13] Cassaday argues that the trial court abused its discretion in instructing the jury on self-defense. Instructing a jury is left to the sound discretion of the trial court, and we review its decision only for an abuse of discretion. *Schermerhorn v. State*, 61 N.E.3d 375, 381 (Ind. Ct. App. 2016), *trans. denied*. "The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Phillips v. State*, 22 N.E.3d 749, 761 (Ind. Ct. App. 2014), *trans. denied*. When reviewing jury instruction decisions for an abuse of discretion, we consider: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the instruction; and (3) whether the substance of the instruction is covered by other instructions given. *Id*. To constitute an abuse of discretion, "the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury." *Id*.

[14] Cassaday contends that the manner in which the trial court instructed the jury on self-defense was an abuse of discretion. Specifically, he first asserts that it

was an abuse of discretion for the trial court to instruct the jury with both the pattern jury instruction on self-defense and a separate instruction that repeated similar language. By giving these two instructions, Cassaday argues that the trial court improperly emphasized that he must have acted without fault in order to sustain a claim of self-defense. He claims that the fact that the jury requested a definition of "without fault" established that the jury's attention was drawn to that legal concept by the repetitive jury instructions.

[15] A certain amount of repetition is inherent in the nature of jury instructions. *Gebhart v. State*, 525 N.E.2d 603, 605 (Ind. 1988). The defendant's substantive rights are not violated by instructions that are to some extent repetitive. *Id.* Instructions become improper and reversal is required only when the instructions are so repetitive as to unduly emphasize a particular point or become argument by the court. *Id.* (citing *Robbins v. Fugit*, 189 Ind. 165, 126 N.E. 321, 322 (1920) (giving fourteen or fifteen instructions on undue influence in will contest case was needless repetition amounting to argument by the court which may mislead the jury)).

[16] In the present case, the trial court provided the jury with the Indiana pattern jury instruction, which stated:

> The Court further instructs you that one person may kill another under such circumstances that the homicide or killing constitutes no crime, but is justified by the law. This is known as the law or doctrine of self-defense and may be, and is thus stated for your guidance:

Whoever, being himself without fault and in a place where he has a right to be, so far as his assailant is concerned, is assaulted, he may, without retreating, repel force by force; and he need not believe that his safety requires him to kill his adversary in order to give him a right to make use of force for that purpose.

When, from the act of the assailant, he believes, and has reasonable ground to believe, that he is in danger of losing his life or receiving great bodily harm from his adversary, the right to defend himself from such danger or apprehended danger may be exercised by him; and he may use it to any extent which is reasonably necessary, and, if his assailant is killed as a result of the reasonable defense of himself, he is excusable in the eyes of the law.

The question of the existence of such danger, the necessity or apparent necessity, as well as the amount of force necessary to employ to resist the attack can only be determined from the standpoint of the defendant at the time and under all the then existing circumstances. Ordinarily one exercising the right to self-defense is required to act upon the instant and without time to deliberate and investigate and under such circumstances a danger which exists only in appearance, may be as real and as imminent to him as if it were actual.

A person in the exercise of the right of self-defense must act honestly and conscientiously.

When all danger and all apparent danger of the loss of life, or of receiving great bodily harm, from the assault of his assailant is at an end and passed, then the right to use force is at an end and should cease. The person exercising the right of self-defense must honestly believe, and have reasonable ground to believe, when he makes use of force to protect himself from an assailant,

that at the time he uses the force it is then necessary to do so to protect his life, or to protect his person from great bodily harm.

One who is in no apparent danger, and who apprehends no danger and who has no reasonable ground for such apprehension cannot kill another and successfully interpose the defense of self-defense.

*Appellant's App. Vol. III* at 16-17. The trial court also gave the following final jury instruction at the State's request and over the objection of Cassaday:

When a Defendant claims self-defense the following facts must exist:

1. That he was in a place he had a right to be;

2. That he acted without fault; and

3. That he had reasonable fear or apprehension of death or great bodily harm.

*Id*. at 18; *Tr. Vol. III* at 151-52.

[17] Both of the instructions given were correct statements of the law, and Cassaday does not argue that they were not. The instruction requested by the State simplified a portion of the language contained in the pattern jury instruction and set out the definition of self-defense in clear, concise language. Further, although Cassaday argues that the State's additional instruction was improper because it unnecessarily emphasized one particular evidentiary fact, we do not agree. The State's additional instruction did not emphasize any evidentiary

facts, and only emphasized the law on self-defense. It did not unduly focus the jury's attention on any one aspect of the case, on any piece of evidence, or on any particular witness's testimony. The State's instruction contained all of the elements of a self-defense claim and not solely the element of without fault. By including all of the elements of a claim of self-defense, the State's instruction did not give any added or undue emphasis to any particular element. The additional instruction provided that, in order for a claim of self-defense to be proven, a defendant must be in a place that he had a right to be, must have acted without fault, and must have had a reasonable fear or apprehension of death or great bodily harm. *Appellant's App. Vol. III* at 18. Therefore, contrary to Cassaday's assertions, none of the concepts of self-defense was given more emphasis than the others.

[18]  Additionally, the trial court instructed the jury as follows:

> In deciding this case, you must determine the facts from a consideration of all the evidence and the law from these instructions and find your verdict accordingly. All of the law of this case has not been embodied in any one instruction. Therefore, in construing any single instruction you should consider it with all the other instructions.

*Id.* at 5. Therefore, the jury was informed that they should consider the jury instructions as a whole and not to put undue emphasis on any one of the instructions. We do not find that the pattern jury instruction and the State's additional requested instruction were so repetitive as to unduly emphasize a particular point or become argument by the court. *See Gebhart*, 525 N.E.2d at

605. We, therefore, conclude that the trial court properly instructed the jury and did not abuse its discretion when it gave the State's requested additional instruction on self-defense.

[19] Cassaday next argues that the trial court abused its discretion when it provided an instruction concerning the phrase "without fault," which purported to define the phrase. Cassaday asserts that this additional instruction invaded the province of the jury by inappropriately emphasizing certain facts and misleading the jury. He maintains that the instruction given by the trial court defining "without fault" misled the jury by emphasizing certain facts and misled the jury by "emphasizing whether he provoked, instigated, or participated willingly in the violence." *Appellant's Br*. at 20. By focusing the jury's attention on whether he provoked, instigated, or participated willingly in the violence, Cassaday contends that the trial court heavily emphasized the confrontation at the restaurant parking lot and implied that "if Cassaday had *any part* of the violence before the fatal shooting, then it would follow that the doctrine of self-defense would not apply," which was misleading to the jury and "prevented the jury from considering all of the evidence at trial." *Id*. (emphasis in original).

[20] During deliberations, the jury sent a question requesting the trial court to further define "without fault," and over Cassaday's objection, the trial court decided to allow both parties an additional five minutes to argue the issue of the meaning of "without fault" to the jury. However, when the jury was brought back into the courtroom, the foreperson told the trial court that additional argument by counsel would not be helpful and that the jury wanted a "legal

definition" of the phrase. *Tr. Vol. III* at 201. The trial court responded that there was not a formal legal definition of "without fault" and sent the jury back to continue deliberations. The State then requested a further instruction defining "without fault" taken from *Driver v. State*, 760 N.E.2d 611 (Ind. 2002). Cassaday objected, but the trial court decided to give the instruction and proceeded to instruct the jury as follows: "According to case law of the State of Indiana, a claim of self-defense requires that the Defendant acted without fault, which has been defined as: '. . . (Defendant) did not provoke, instigate, or participate willingly in the violence.'" *Appellant's App. Vol. III* at 2; *Tr. Vol. III* at 207.

[21]     Indiana Code section 34-36-1-6 provides:

> If, after the jury retires for deliberation:
>
> (1) there is a disagreement among the jurors as to any part of the testimony; or
>
> (2) the jury desires to be informed as to any point of law arising in the case; the jury may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or the attorneys representing the parties.

But once deliberations commence, the trial court should not give additional instructions. *Dowell v. State*, 973 N.E.2d 58, 60 (Ind. Ct. App. 2012) (citing *Crowdus v. State*, 431 N.E.2d 796, 798 (Ind. 1982)). "This rule prevents the trial court from giving special emphasis, inadvertent or otherwise, to a particular

issue in the case, and thus avoids the possibility that the additional instruction might tell the jury what it ought to do concerning that issue." *Id*. When confronted with a question from a jury that has begun its deliberations, the trial judge must respond in a manner that accords with the legal requirements for final instructions and is fair. *Id*. (citing *Jenkins v. State*, 424 N.E.2d 1002, 1003 (Ind. 1981)). "The 'path is extremely hazardous' for the court that would depart from the body of final instructions and do other than reread the final instructions in responding to jury questions." *Id*. Such a departure will be warranted in only the most extreme circumstances and must serve to amend the final instructions by adding a necessary one previously omitted or correcting an erroneous one and must be fair to the parties in the sense that it should not reflect the judge's view of factual matters. *Id*.

[22] Only when the jury question coincides with an error or "legal lacuna" in the final instructions will a response other than rereading from the body of final instructions be permissible. *Id*. A "lacuna" is an "empty space or missing part; a gap." *Downs v. State*, 656 N.E.2d 849, 852 n.4 (Ind. Ct. App. 1995) (quoting The American Heritage Dictionary of the English Language 732). If the trial court decides to give an additional instruction because the question relates to a "legal lacuna," the trial court must reread all of the instructions so that the additional instruction will not be over-emphasized. *Dowell*, 973 N.E.2d at 60 (citing *Graves v. State*, 714 N.E.2d 724, 726 (Ind. Ct. App. 1999)).

[23] Here, after beginning deliberations, the jury requested further definition of the phrase "without fault" as it connected with the previously-given instruction on

self-defense because the jury desired clarity as to what the phrase meant. *Tr. Vol. III* at 201. The trial court eventually gave the jury an additional instruction concerning the phrase "without fault," but did not re-read the rest of the instructions; the jury later returned a guilty verdict. The procedure employed by the trial court gave that instruction "the type of improper emphasis" that prior cases have attempted to alleviate because the trial court did not re-read the entire set of final instructions contemporaneously with the giving of the additional instruction. *Dowell*, 937 N.E.2d at 62; *see Crowdus*, 431 N.E.2d at 798; *Graves*, 714 N.E.2d at 727. Therefore, "an additional instruction tended to 'emphasize that issue as being of primary importance and . . . to tell the jury what it ought to do.'" *Dowell*, 937 N.E.2d at 62 (quoting *Hero v. State*, 765 N.E.2d 599, 603 (Ind. Ct. App. 2002), *trans. denied*). We conclude that the trial court abused its discretion when it failed to re-read the entire set of final instructions contemporaneously with the giving of the additional instruction.

[24] Although we conclude that the trial court erred in instructing the jury, reversal is not necessary. Any error in instructing the jury is subject to a harmless-error analysis. *Dixson v. State*, 22 N.E.3d 836, 840 (Ind. Ct. App. 2014), *trans. denied*. "Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have affected the jury's verdict." *Id*. To obtain reversal on appeal based upon an erroneous jury instruction, a defendant must affirmatively demonstrate that the instructional error prejudiced his substantial rights. *Minor v. State*, 36 N.E.3d 1065, 1072 (Ind. Ct. App. 2015), *trans. denied*.

[25] The evidence presented at trial showed that Cassaday and other club members traveled to the Texas Roadhouse after discovering that Lute was there and went there to confront Lute. Before leaving his home, Cassaday retrieved his handgun and had it in his car when he went to give Lute his "two cents." *Tr. Vol. III* at 138, 140. As Lute left the restaurant after eating dinner with friends, Cassaday and his friends converged on Lute and surrounded him. *Tr. Vol. I* at 82, 144, 192-93. Cassaday initiated a verbal and physical confrontation with Lute by attacking him verbally, pushing him, and "throwing a punch at him." *Id*. at 249. After this confrontation with Cassaday and after Lute had shot Elkins, Lute retreated from the situation and ran behind the restaurant. At this point, Briggs yelled that Elkins had been shot and that "[Lute's] coming around the building, somebody grab him, somebody get him." *Id*. at 201-02, 229; *Tr. Vol. II* at 38.

[26] Instead of disengaging from the situation, Cassaday went to his car, retrieved his handgun, and proceeded to walk toward the front of the restaurant. As soon as Lute turned the corner of the building, Cassaday raised his handgun to the level of his shoulders, paused for about one to two seconds to aim, and fired at Lute. *Tr. Vol. I* at 203-04; *Tr. Vol. II* at 39-40, 201-02. After shooting Lute and watching him fall to the ground, Cassaday quickly returned to his car and gave the handgun back to Bovie and told her to tell the police it was hers. Cassaday then rapidly drove around the parking lot in his vehicle, picking up club members and the injured Elkins. Cassaday hurriedly left the scene, leaving Lute dead on the ground, and did not mention shooting Lute to anyone. The

evidence presented was sufficient to establish that Cassaday and his friends instigated a violent confrontation with Lute, and when Lute disengaged from the conflict, Cassaday continued this violence by obtaining his handgun and pursuing Lute, and shooting him, instantly killing him. We, therefore, conclude that the evidence presented at trial showed that Cassaday did not act without fault, and we cannot conclude that the error in instructing the jury affected its verdict or prejudiced Cassaday's substantial rights.

[27] Affirmed.

Bailey, J., and Pyle, J., concur.