## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 14 2018, 5:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Evan K. Hammond
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Waylon L. Sadler,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 14, 2018

Court of Appeals Case No.
27A02-1711-CR-2562

Appeal from the Grant Circuit Court

The Honorable Mark E. Spitzer, Judge

Trial Court Cause No.
27C01-1601-MR-1

**Darden, Senior Judge.**

# Statement of the Case

Waylon L. Sadler appeals his convictions of murder, a felony;[1] battery resulting in serious bodily injury,[2] a Level 5 felony; criminal confinement resulting in serious bodily injury, a Level 3 felony;[3] and intimidation with a deadly weapon, a Level 5 felony.[4] We affirm.

# Issues

Sadler raises three issues, which we restate as:

    I.    Whether the trial court abused its discretion in denying Sadler's request to replace a seated juror with an alternate juror.

    II.    Whether the trial court abused its discretion in denying Sadler's motion for mistrial.

    III.    Whether the trial court abused its discretion in instructing the jury on sudden heat.

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code § 35-42-2-1 (2014).

[3] Ind. Code § 35-42-3-3 (2014).

[4] Ind. Code § 35-45-2-1 (2014).

# Facts and Procedural History

[3] In late 2015, James Zook, Jr., was in ill health. He had diabetes and was prone to seizures if his blood sugar was too high or too low. One of his toes had been amputated due to complications from diabetes. In addition, Zook had circulation problems in his legs caused by bone deterioration, and he had further suffered a stroke that limited his mobility on one side of his body and limited the use of one of his arms. He used a motorized wheelchair when he left his house, and he walked with a cane inside his house. Zook's daughter, Shannon Collins, moved into his house in September 2015 to help take care of him. Collins' boyfriend, Sadler, joined her. At the time, Sadler was on parole and was not allowed to possess weapons, including knives; however, he owned a black pocketknife.

[4] Collins and Sadler argued from time to time, which irritated Zook. In addition, Zook's relationships with Collins and Sadler were contentious. He and Collins argued, and he occasionally grabbed her and shook her. In addition, Zook was irritated that Sadler did not pay rent or help around the house. In December 2015, Zook stated he wanted Sadler to move out.

[5] On the evening of Monday, January 11, 2016, Collins' mother, Sheila Schrameck, dropped off Collins' four-year-old son, K.C., at Zook's house. At some point during the evening, Collins called K.C.'s father and arranged for him to pick up K.C. in the morning.

[6]     Two days prior to January 11, 2016, Collins had experienced what she believed was a miscarriage. On the evening of January 11, she argued with Zook, claiming he may have caused the miscarriage by shoving her. Although Sadler was not in the room during the argument, he may have heard it because Zook's house was small. Collins then watched a movie with K.C. in the living room before going to the bedroom she shared with Sadler, where she fell asleep.

[7]     At around 2 a.m., Collins was awakened by a loud thud, and she thought Zook might have fallen in his bedroom. Sadler was not in their bedroom. She immediately went to Zook's bedroom and found him on the floor, "with blood all around his neck." Tr. Vol. 2, p. 6. Zook was making gurgling noises and blood was coming from his neck. Collins tried to stop the bleeding, but was unsuccessful, and Zook died. She closed his eyes and left the room.

[8]     Next, Collins went into her bedroom to find a telephone to call for help. Sadler was sitting on the futon bed, with Zook's mobile phone in his hands. She asked Sadler, "why did you kill my dad," and tried to grab the telephone from him. *Id.* at 9. At that point, Sadler punched her in the nose, causing profuse bleeding. He then said, "you guys won't be arguing or something to that affect [sic] anymore." *Id.*

[9]     Sadler then went to the bathroom, and Collins locked the bedroom door before continuing to search for her mobile phone. Sadler kicked open the door and reentered the room. He took Collins' telephone from her. Collins went to K.C., who remained asleep during these events, but Sadler told her to return to

the bedroom. She was afraid and begged him not to hurt K.C. Sadler and Collins laid down on the futon, and Collins tried to keep him calm. She noticed that Sadler had a deep cut on his thumb. They eventually fell asleep.

[10] When Collins awoke, the sun had risen. Sadler was awake and told her they should create a story about a break in or another explanation for Zook's death that did not involve him. He further told her to go down to the basement and turn on the hot water so that they could clean up the blood. Due to Sadler's agitated state, and fearful for K.C.'s safety, Collins told Sadler that K.C.'s father would soon arrive to pick up K.C., and she suggested that it would be better if she called Schrameck, her mother, to pick up K.C. instead. Sadler agreed that K.C. could leave with Collins' mother, but Collins would have to stay and help clean up the house.

[11] Meanwhile, Schrameck had finished her overnight shift at work and was driving home when Collins called to ask her to pick up K.C. Sadler was sitting near Collins as she made the call, monitoring what she said. Schrameck heard Sadler yelling in the background, and Collins sounded nervous. Collins told her mother to park in the alley behind the house instead of the driveway. It was snowing outside, and Collins explained that the driveway would pose a problem because it had not been plowed; but, in reality she wanted Schrameck to park in the alley so that she could drive away without having to back up. Collins then changed her clothes, which were bloody, attempted to rinse blood out of her hair, and woke up K.C. The two went and stood outside in the alley

with K.C.'s car seat. She looked back at the house and saw Sadler watching her from the back door.

[12] Schrameck arrived in the alley, where Collins and K.C. were waiting for her. Collins opened Schrameck's passenger side door and put K.C. in his child seat. Collins said loudly that she was strapping K.C. in his car seat. Collins then jumped into the car and, in a panicked state, told Schrameck to drive away. Schrameck was confused but told Collins to close the passenger door. Collins then screamed, "[H]e killed dad. Go, go, go!" *Id.* at 27.

[13] At that point, Sadler ran up to the car from around the corner of a garage, wielding a baseball bat. He struck the windshield, fracturing it, as Schrameck began to drive away. Sadler smashed the driver's side window as Schrameck continued to drive away, causing glass shards to fall inside the car. Sadler ran after the car shouting, "I'll kill you b*****s!" Tr. Vol. 1, p. 140. A neighbor's security camera recorded Sadler's attack on Schrameck's car and further showed that he ran back to Zook's house, clutching the bat.

[14] Collins called the police using Schrameck's cell phone. An officer met them at a nearby store. Collins ran up to the officer and said, "her boyfriend had killed her dad." *Id.* at 173. Officers took Schrameck, Collins, and K.C. to the police station for questioning while other officers went to Zook's house. Upon arriving at Zook's house, officers discovered that the back door was open even though it was cold and snowing. They entered the house and found Zook's body in his bedroom. One of the officers saw a slashing wound on Zook's

neck, and blood was pooled on the floor around his head. The officers also found a baseball bat in the house with shards of glass embedded in it. Sadler was not present.

[15] Meanwhile, John Rush, who lived in Zook's neighborhood, was awakened by someone "pounding" on his front door. *Id.* at 161. He slightly opened the door and saw a man, later identified as Sadler, standing there. Sadler was "agitated, irritated and talking so fast that you couldn't make out what he was saying." *Id.* at 162. Rush determined that Sadler wanted to enter his house and use his phone. Rush rejected Sadler's request and told him to leave, but Sadler stuck his foot in the doorway. Rush, who was armed, again told Sadler to leave, and Sadler left. Ten minutes later, police officers arrived at Rush's home. They had followed footprints in the snow from Zook's house and learned that Sadler had been there.

[16] Next, Roger Pence, who also lived in Zook's neighborhood, was alerted by his dogs that someone was walking through his yard and approaching his back door. Pence saw a man he did not recognize. The man, later identified as Sadler, left the back door and approached Pence's truck. Pence had left the truck unlocked, and Sadler got in. Pence went outside and yelled at Sadler to get out of his truck. Sadler got out and approached Pence, saying he needed a lift to Wabash. Pence told him to leave before he called the police. Sadler apologized and walked away.

[17]     An officer later took Sadler into custody after he spotted Sadler walking along the roadway that led to Wabash, Indiana. Sadler initially ran from the officer and attempted to enter a nearby house, but eventually surrendered at gunpoint. He had bloodstains on his pants, and the officers found two cell phones in his clothes. The officers noticed Sadler had a deep cut on one of his thumbs and took him to the hospital for treatment before incarcerating him.

[18]     A few days later, Sadler told officers he would show them where he had discarded his knife. They drove him to Zook's neighborhood, and he pointed out a trash can in an alley. The officers looked in the can and found a black pocketknife. They submitted the knife for DNA testing, and testing revealed there was a mixture of Zook's and Sadler's blood on the knife. Additionally, DNA testing revealed Zook's blood on Sadler's jeans.

[19]     An autopsy of Zook's body revealed he died from "stabbing and blunt force trauma with punctured jugular and laryngo [sic] tracheal fracture." Tr. Vol. 2, p. 156. The blunt force trauma and the stab wound were inflicted by separate attacks on Zook.

[20]     The State charged Sadler with murder, battery resulting in serious bodily injury (for punching Collins in the face), criminal confinement resulting in serious bodily injury (for preventing Collins from leaving the house), and intimidation with a deadly weapon (for attacking Schrameck's car with a baseball bat). Sadler was tried by a jury. He initially presented a self-defense claim and argued alternatively that, at most, he may have been guilty of manslaughter

rather than murder.  The jury found Sadler guilty of murder as charged.  The court imposed sentencing, and this appeal followed.

# Discussion and Decision

## I. Replacement of Seated Juror with Alternate

[21] Sadler first argues that the trial court erred in not replacing a seated juror who had been seen briefly interacting with one of Zook's relatives after the trial began.  If a seated juror is determined to be unable or disqualified to perform their duties, the court shall replace the juror with an alternate juror.  Ind. Trial Rule 47(B).  Trial courts have broad discretion in determining whether to replace a seated juror with an alternate juror, and we will reverse such determinations only where we find them to be arbitrary, capricious or an abuse of discretion.  *Harris v. State*, 659 N.E.2d 522, 525 (Ind. 1995).  In this context, an abuse of discretion occurs if the trial court's decision placed the defendant in substantial peril.  *Id.*

[22] Because of the fundamental role of the jury in our system of justice, a rebuttable presumption of prejudice arises where a juror has participated in out-of-court communications.  *Timm v. State*, 644 N.E.2d 1235, 1237 (Ind. 1994).  Such juror misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred, and that it pertained to a matter pending before the jury.  *Currin v. State*, 497 N.E.2d 1045, 1046 (Ind. 1986).  In these circumstances, a trial court must often "weigh the nature and extent of a juror relationship with a party or witness established pre-trial and

arising in the normal, and often inevitable, course of interaction in an employment or community environment." *May v. State*, 716 N.E.2d 419, 421 (Ind. 1999) (emphasis omitted). Our review of the trial court's decision in these matters is highly deferential. *Id.*

[23] In the current case, jury selection took place on August 28, 2017. The trial court read to the potential jurors a list of names of potential witnesses who may be involved in the pending case and asked if they recognized any of them. Juror Number One stated that he recognized the name of Zook, believing he might be the son of a classmate from high school. A jury panel was selected, including Juror Number One and an alternate, and the court adjourned for the day.

[24] On the morning of August 29, 2017, it was brought to the trial court's attention that a juror may have interacted with one of the victim's family members in the courthouse that morning. The trial court conducted a hearing, and Deputy Warren Sample of the Grant County Sheriff's Department testified that he witnessed the following encounter:

> [Deputy Sample]: I had two gentlemen come in early, approximately ten minutes til eight and told [sic] me that they were family members. They did not state whether it was the victim or the Defendant. I did not ask, but I told them that they couldn't go up yet cause there was . . . nothing was opened and I told them they could wait on the bench just down the hall. As some of the jurors started filing in, juror number one [. . .] came in and started to come upstairs and as he passed the two family members, they recognized each other and I couldn't hear the exact words, but they shook hands and it sounded like [Juror

Number One] said I recognized the name and I also heard him say that he was a juror, a jurist and it was a very cordial meeting. They were jovial, smiling and as he walked off, it sounded like the family member said well that's good, something to that affect and that was it.

[The Court]: That's good with regards to the fact that he was a juror?

[Deputy Sample]: That he was a juror. That's the way it sounded to me.

Tr. Vol. I, p. 109. After the family member made that statement, Juror Number One "smiled and continued on to the elevator." *Id.* at 111. To the deputy, it appeared to be a "cordial chance meeting." *Id.* at 110.

[25] Next, Juror Number One testified. He explained that one of the men, Joe Zook (Joe), was his classmate and that he had not seen him since they graduated from high school in 1980. In fact, he did not even recognize Joe at first sight. Juror Number One further stated Joe asked Juror Number One if he was on jury duty, and he said he was. Next, Joe told Juror Number One, "you're a good man." *Id.* at 113. The juror did not discuss the encounter with his fellow jurors. Subsequently, the following exchange occurred:

BY THE COURT Okay. Did that . . . would that interaction in any way affect your service as a juror or your ability to look at the case objectively or anything like that in your mind?

JUROR #1 No certainly not.

*Id.* at 114. Juror Number One further stated, under questioning by the parties, that he believed he could still be fair and impartial and would not be uncomfortable sitting in the courtroom with the decedent's relatives.

[26] After receiving the testimony of the witnesses, the trial court concluded, "I think for the record, my determination in judging the demeanor of [Juror Number One] and the remoteness of the connection that he had with the family member, um, I don't believe that there was anything there that gave me, um, any, um, indication that he would not, um, be objective." *Id.* at 115-16. He noted Zook "is an individual who [Juror Number One] hasn't seen in thirty-seven years . . . ." *Id.* at 116.

[27] We find that there was an out-of-court communication, and a rebuttable presumption of prejudice applies. However, we conclude there is ample evidence in the record to rebut the presumption of prejudice. The evidence reveals that Joe was not a close friend or even a close acquaintance of Juror Number One, as they had not seen one another for thirty-seven years. Their discussion was brief and limited in scope. The juror stated he would be fair and impartial, and he would be a fair and objective juror despite the brief interaction. The juror further stated Joe's presence in the courtroom would not make him uncomfortable. The trial judge was in the best position to weigh the evidence and observed the juror's demeanor while making the determination that the juror could remain impartial.

[28] Under the facts and circumstances in this case, the trial court's decision to allow Juror Number One to remain on the panel did not place Sadler in substantial peril, and the trial court did not abuse its discretion. *See Spears v. State*, 811 N.E.2d 485, 489-90 (Ind. Ct. App. 2004) (no abuse of discretion in declining to replace juror; juror had a brief encounter with a witness during a break in the trial, but the two persons had not met before and the juror stated he would remain impartial).

## II. Motion for Mistrial

[29] Sadler argues the trial court erred in denying his motion for mistrial after Shannon Collins inadvertently violated the trial court's order in limine while testifying. A mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation. *Hale v. State*, 875 N.E.2d 438, 443 (Ind. Ct. App. 2007) (quotation omitted), *trans. denied*. On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004). We therefore review the trial court's decision solely for abuse of discretion. *Id.* The appellant must demonstrate that the conduct complained of was both erroneous and had a probable persuasive effect on the jury's decision. *Hale*, 875 N.E.2d at 443.

[30] Prior to trial, the court granted Sadler's motion in limine and prohibited any reference at trial to his criminal history. During trial, Collins testified as follows:

[State]: Shannon, did Waylon have any knives?

[Collins] Yes.

[State] What kind of knives did he have?

[Collins] It was like pocket knives with a clip on them. One of them had a clip on it. I'm not sure if the other one did or not.

[State] Okay and was it a clip . . . what kind of clip . . . what was the clip for?

[Collins] To like put on your pants or something, your pocket.

[State] Is that where he would keep it?

[Collins] Usually, yeah.

[State] What color was that?

[Collins] Black.

[State] Do you recall when he had got that?

[Collins] I don't know exactly when he bought it, but he bought it when he wasn't with me because he wasn't suppose [sic] to have knives anyways. Or . . . I'm sorry.

Tr. Vol. II, pp. 30-31. According to Sadler's trial attorney, when Collins said "I'm sorry" she simultaneously pulled her shirt up to briefly cover her face. *Id.* at 34.

[31] The State quickly changed its line of questioning regarding the knife, never mentioned or alluded to it again, and continued to question Collins for several more minutes about other matters. After the State ended its direct examination, out of the presence of the jury Sadler moved for a mistrial, arguing Collins violated the order in limine. The court ruled as follows:

> Okay. So I think that it was clearly inadvertent. Um, you know, did it violate the Court's order in limine, yes, arguably it did. Um, but it was inadvertent. I did look at the jury after she made the comment, I didn't see it register with anybody or they did not appear to have, um, I did not see any juror take note of it in any overt fashion. Um, I think that to admonish the jury at this time would simply call to . . . would additionally call attention to it so, um, it's the Court [sic] decision to let it pass at this time. I'm gonna deny the motion for mistrial, um, and will . . . I'm not going to admonish . . . ."

*Id.* at 42.

[32] On the morning of the next day of trial, the court held a hearing outside the presence of the jury. The trial court explained for the record that it had received information that when one of the jurors had left the courthouse the prior evening, he or she had asked the bailiff why Sadler was not supposed to have a knife. The bailiff instructed the juror to address the question to the judge, in writing. After the trial court explained the situation to the parties, Sadler

renewed his motion for mistrial. The trial court denied the renewed motion, reiterating that the violation of the order in limine was inadvertent and concluding that Sadler had not been placed "in great peril." *Id.* at 54. The trial court further stated that if the juror submitted the question in writing, then the court planned to admonish the jury to disregard the issue.

[33] The jury was brought into the courtroom, and Collins returned to the witness stand. At that point, a juror submitted a written question asking why Collins apologized for stating Sadler was not supposed to have a knife and further requesting additional information. During a subsequent bench conference outside the hearing of the jury, the trial court reaffirmed that it was denying the request for a mistrial and would give an admonishment. Next, the trial court gave the following admonishment to the jury:

> Okay. Juror question, uh, number one, um, was tendered and, um, it is not my . . . uh, it's not an appropriate question to ask the witness. Relates to matters that really aren't relevant to your determination and you shouldn't speculate about, um, uh, about what, uh, those matters are, um, and so I am not going to answer that question as it was . . . it's not one that would be permitted to be asked . . . .

*Id.* at 57.

[34] Sadler argues that Collins violated the order in limine by stating he was not supposed to have knives. He further argues Collins' violation placed him in grave peril because it had a persuasive effect on the jury, noting that one juror followed up on Collins' testimony by submitting a written question. In support

of his motion for mistrial, Sadler argued that a possible theory of his defense of the case was that he may have committed manslaughter rather than murder, and if the jury knew that he was barred from having a knife but chose to carry one anyway, that information may have had a persuasive effect by undercutting his claim that he acted under the influence of sudden heat.

[35] We do not agree that Collins' inadvertent and isolated remark placed Sadler in grave peril. Sadler did not immediately object to the remark, nor did he immediately ask to have the remark struck from the record or request an admonishment. Instead, he waited until Collins' testimony on direct examination was finished before moving for a mistrial. At that time, the trial court explained that it had looked at the jurors' demeanor after Collins made the remark, and determined that the jurors did not appear to show any response or to have focused on Collins' remark. The trial court's ruling was reasonable under the facts and circumstances at the time, particularly because Collins' remark was ambiguous and did not directly implicate Sadler's past involvement in any criminal activities, and in addition the prosecutor quickly moved on to another topic. *Cf. Lehman v. State*, 777 N.E.2d 69, 73 (Ind. Ct. App. 2002) (trial court erred in denying motion for mistrial; witness testified that Lehman had committed acts against "nine other victims.").

[36] Herein, the next day, after a juror had asked the bailiff why Sadler was not supposed to have a knife, and had submitted to the trial court a written question on the same topic, the trial court admonished the jury to disregard the question as an inappropriate question to ask the witness and the question was not

relevant to this case. The court further directed the jury not to speculate about that irrelevant issue in making their determination in the present case. A timely and accurate admonition is presumed to cure any error in the admission of evidence. *James v. State*, 613 N.E.2d 15, 22 (Ind. 1993). Further, there is no evidence that the juror had discussed the question with other jurors before submitting the question to the trial court. Finally, the trial court admonished the jury; and, after reviewing the totality of the evidence presented at trial establishing Sadler's guilt for murder, we conclude it is unlikely Collins' inadvertent and isolated remark, which did not implicate Sadler's criminal record or parole status, had a persuasive impact on the jury. "We presume juries follow the admonitions of the court." *Tharpe v. State*, 955 N.E.2d 836, 842 (Ind. Ct. App. 2011), *trans. denied*. The trial court did not abuse its discretion in denying Sadler's motion for a mistrial. *See Banks v. State*, 761 N.E.2d 403, 405 (Ind. 2002) (no error in denying motion for mistrial after witness referred to Banks' criminal history; admonishment was sufficient to correct any error).

### III. Jury Instruction – Sudden Heat

[37] Sadler argues the trial court erred in accepting the State's proposed Final Instruction 15, and reading it to the jury. He claims it duplicated other instructions and unfairly shifted the burden of proof to him.

[38] The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case

clearly and arrive at a just, fair, and correct verdict. *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003). Our standard for deciding whether the trial court erred in instructing the jury is well settled and affords great deference to the trial court. *Reed v. State*, 720 N.E.2d 431, 434 (Ind. Ct. App. 1999), *trans. denied*. Instructing a jury is left to the sound discretion of the trial court, and we review its decision only for an abuse of discretion. *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013).

[39] In reviewing a trial court's decision to give or refuse tendered jury instructions, this Court considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000). An abuse of discretion arises when the instruction is erroneous and the instructions taken as a whole misstate the law or otherwise mislead the jury. *Isom v. State*, 31 N.E.3d 469, 484-5 (Ind. 2015).

[40] In Sadler's case, both parties submitted proposed jury instructions on voluntary manslaughter. The trial court's Final Instruction 4 followed the Indiana Pattern Jury Instruction definition for murder and voluntary manslaughter, explaining that the State was required to prove beyond a reasonable doubt that Sadler was not acting under sudden heat. In addition, Final Instruction 14 defined "sudden heat" using the Indiana Pattern Jury Instruction, as follows:

> The term "sudden heat" means a mental state which results from provocation sufficient to excite in the mind of the defendant such

emotions as anger, rage, sudden resentment, jealousy, or terror sufficient to obscure the reason of an ordinary person, and as such prevents deliberation and premeditation, excludes malice, and renders the defendant incapable of cool reflection prior to acting.

Appellant's App. Vol. 2, p. 53. The State submitted an additional proposed instruction providing that anger, standing alone, does not establish sudden heat. After discussing all of the instructions with the parties, the trial court also in addition accepted the State's proposed instruction and read it to the jury as Final Instruction 15: "Anger, standing alone, is not sufficient for sudden heat." *Id.* at 53-54.

[41] Final Instruction 15 was a correct statement of law, because it is well established that anger without provocation is insufficient to establish sudden heat. *Matheney v. State*, 583 N.E.2d 1202, 1205 (Ind. 1992). Further, there was evidence in the record to support giving the instruction. The jury learned that there was past animosity between Zook and Sadler, and the trial court was justified in explaining that mere anger, standing alone, was insufficient to prove sudden heat. In addition, Final Instruction 15 did not duplicate Final Instruction 14 because it addressed a distinct, albeit related, principle of sudden heat. Finally, we cannot agree that Final Instruction 15 improperly shifted the burden of proof to Sadler. Reading all of the instructions as a whole, Final Instruction 4 unequivocally instructed the jury that the State bore the burden of disproving the existence of sudden heat beyond a reasonable doubt. The trial court did not abuse its discretion.

# Conclusion

[42] For the reasons stated above, we affirm the judgment of the trial court.

[43] Affirmed.

[44] Riley, J., and Kirsch, J., concur.